IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 113,149

STATE OF KANSAS,
*Appellee*,

v.

BRYANT A. SEBA,
*Appellant*.

SYLLABUS BY THE COURT

1.

When a homicidal act is directed against one other than the person killed, the responsibility of the actor is the same as it would have been had the act been completed against the intended victim.

2.

The transferred intent doctrine does not offend K.S.A. 2015 Supp. 21-5402, Kansas' first-degree murder statute; it does not change or conflict with the statute. Rather, the doctrine merely clarifies that evidence of a defendant's intent to kill a particular person can be sufficient to prove the mental state element of first-degree premeditated murder even if a person other than the intended victim is murdered at the defendant's hands.

3.

Under the facts of this case, the transferred intent doctrine provided sufficient evidence to support convictions for both the death of a pregnant unintended victim and,

under K.S.A. 2015 Supp. 21-5419, the death of her "unborn child," and the district court properly instructed the jury on the doctrine.

4.

An intentional and premeditated killing is a first-degree murder. The lesser included crime of reckless second-degree murder is a killing done unintentionally but recklessly under circumstances manifesting extreme indifference to the value of human life. A person acts recklessly by consciously disregarding a substantial and unjustifiable risk that circumstances exist or that a result will follow, and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation. The distinction between reckless second-degree murder and first-degree premeditated murder is, at its core, the intent to kill requirement of first-degree premeditated murder.

5.

A defendant who argues that a district court erred in failing to instruct a jury on the lesser included offenses of reckless second-degree murder and reckless involuntary manslaughter fails to establish clear error—*i.e.*, fails to firmly convince the appellate court that the jury would have reached a different result—when overwhelming evidence supports a conclusion that the defendant intended to kill a human being and premeditated the killing.

6.

A first-degree premeditated murder conviction requires death to have been the intended result of an act. Nevertheless, a jury instruction explaining that a "defendant acts intentionally when it is the defendant's desire or conscious objective *to do the act* complained about by the State"—rather than saying that "the defendant acts intentionally

when it is the defendant's desire or conscious objective *to cause the result* complained about by the State"—is legally appropriate when the instruction also informs the jury it must find that the defendant "intentionally killed." Taken as a whole, the instruction properly informs the jury of the intent requirement.

7.

Under K.S.A. 2015 Supp. 21-5404(a)(2), imperfect self-defense voluntary manslaughter is knowingly killing a human being upon an unreasonable but honest belief that circumstances existed that justified use of deadly force in defense of a person, in defense of a dwelling, or in defense of other property.

8.

An unreasonable but honest belief that circumstances existed that justified deadly force will not support a claim of imperfect self-defense unless the circumstances, if reasonably believed, would have supported a claim of perfect self-defense under K.S.A. 2015 Supp. 21-5222.

9.

Because the legislature determined voluntary manslaughter required a knowing mental state—meaning voluntary manslaughter is a general intent crime—voluntary intoxication is not legally available as a defense.

10.

When considering an issue challenging a district court's decision to admit photographs into evidence, an appellate court must first determine whether they are relevant. Evidence is relevant, meaning it is admissible, if it has any tendency in reason to prove any material fact. Nevertheless, even relevant evidence can be inadmissible if a

substantial risk of unfair prejudice outweighs the evidence's probative value. If a party argues that the photographs are overly repetitious, gruesome, or inflammatory, that is to say, prejudicial, the standard of review is abuse of discretion.

11.

Autopsy photographs demonstrating the fact and manner of death are relevant and admissible even if the cause of death is not contested. Moreover, photographs are relevant if they show the extent, nature, and number of wounds inflicted or if the photographs assist the pathologist in explaining the cause of death.

12.

Gruesome crimes result in gruesome photographs, but accurate representations of a crime typically do not unduly prejudice a defendant.

13.

In a cumulative error analysis, an appellate court aggregates all errors and, even though those errors would individually be considered harmless, analyzes whether their cumulative effect on the outcome of the trial is such that collectively they cannot be determined to be harmless.

14.

In making the assessment of whether cumulative errors are harmless error, an appellate court examines the errors in the context of the record as a whole considering how the district court dealt with the errors as they arose (including the efficacy, or lack of efficacy, of any remedial efforts); the nature and number of errors committed and their interrelationship, if any; and the strength of the evidence. No prejudicial error may be

found upon this cumulative effect rule if the evidence is overwhelming against the defendant.

Appeal from Pratt District Court; FRANCIS E. MEISENHEIMER, judge. Opinion filed September 30, 2016. Affirmed.

*Michelle A. Davis*, of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant.

*Kristafer R. Ailslieger*, deputy solicitor general, argued the cause, and *Derek Schmidt*, attorney general, was with him on the brief for appellee.

The opinion of the court was delivered by

LUCKERT, J.: Following a period of escalating tension between Bryant A. Seba and others, Seba fired nine shots toward those with whom he had been fighting. He killed a pregnant bystander and repeatedly shot one of the men, resulting in the man's paralysis. The State charged Seba with two counts of first-degree premeditated murder. One of Seba's two first-degree premeditated murder counts was based on Alexa's law, which defines murder to include the killing of an "unborn child"—defined in K.S.A. 2015 Supp. 21-5419(a)(2) as "a living individual organism of the species homo sapiens, in utero, at any stage of gestation from fertilization to birth." The State also charged Seba with one count of attempted first-degree murder. The jury convicted him of all three charges.

To prove the intent requirement of both first-degree premeditated murder counts, the State used the transferred intent doctrine, arguing Seba premeditated the murder of the men with whom he had been fighting and his guilt was the same as it would have been had he hit his intended targets. On appeal, Seba argues that the doctrine of transferred intent does not apply in this case and that both counts can only be charged

5

(and lead to convictions of) first-degree felony murder—*i.e.*, convictions based on deaths that occurred during the course of some other crime. Alternatively, he argues the transferred intent doctrine can only apply to the count for the murder of the bystander and not to the Alexa's law count.

Seba also contends the district court clearly erred by failing to instruct the jury on the lesser included offenses of reckless second-degree murder and reckless involuntary manslaughter; incorrectly instructing the jury on the definition of "intentionally" in the context of first-degree murder; failing to instruct the jury on the lesser included offense of imperfect self-defense voluntary manslaughter; and incorrectly instructing the jury that voluntary intoxication is not a defense to voluntary manslaughter and attempted voluntary manslaughter. In addition, raising an issue not related to the jury instruction, Seba claims the district court erred by admitting certain autopsy photographs. Finally, he argues that the cumulative effect of these errors denied him a fair trial.

We reject Seba's arguments regarding transferred intent and we also conclude Seba fails to establish clear error in the jury instructions. Further, we hold the district court did not err in admitting the photographs about which he complains. Finally, we conclude Seba is not entitled to a new trial because of cumulative error. We accordingly affirm Seba's convictions and sentences.

FACTS AND PROCEDURAL BACKGROUND

Seba and Matthew Rost had been arguing throughout the day of July 24, 2013. According to Seba, he sold Rost a video game and Rost refused to pay the $25 he owed. The men exchanged several disparaging text messages, some with racial overtones. Tensions escalated that evening when Seba, who had been drinking, sat on his front porch

6

and yelled racial slurs towards Rost's apartment complex, which was one house away. Witnesses at the residence sandwiched between Seba's house and Rost's apartment testified to hearing Seba repeatedly call Rost a "nigger lover."

Rost lived with his girlfriend, Tiffany Foreman, an African American. At one point during Seba's onslaught of racial slurs, Seba walked down to Rost's apartment and kicked the door. Foreman, alone in the apartment at the time, became frightened and called her brother to ask if he could contact her cousin and ask him to come over and stay with her so she was not alone. After kicking the door, Seba returned to his house, got on his motorcycle, and rode it around the block a few times, revving the engine in front of Rost's apartment.

Rost later returned to his apartment. Another group soon arrived—Foreman's two cousins, her brother, and a friend. Foreman told the men Seba had tried to kick in the apartment door, and Rost vaguely indicated that he and Seba had been arguing. One of Foreman's cousins, Brandon Wright, walked down the sidewalk toward Seba's house and asked Seba, who was standing on his porch, why he had kicked Foreman's door. Seba called Brandon Wright a "nigger" and threatened to shoot him. During this exchange, Brandon Wright's brother, Zachary, crept along some shrubbery in front of Seba's porch, got behind Seba, and pushed him off the porch. Seba and the Wright brothers began to fight in the front yard.

Neighbors at the residence in between Seba's house and Rost's apartment had been aware of the escalating conflict throughout the evening. When the fight between Seba and the Wright brothers started, one of those neighbors went over to break it up. He pulled the men apart, at which point Seba got up and ran back into his house. As he fled, he said

7

something like, "I'm going to kill you motherfuckers," or, "You are going to get shot, nigger."

Around the same time Seba was escaping into his house, Alexandria Duran—who also lived next door to Seba and was the niece of the man who had interceded in the fight—stepped in to try to calm the situation between the Wrights and her uncle. Zachary Wright and others fled; they later would say they ran because they had heard Seba's threats and knew he was a good shot. As Duran tried to ease tensions between her uncle and Brandon Wright, Seba exited his front door, stepped onto his porch, and fired a shot from his .22 caliber rifle, which had been modified for accuracy. The shot hit Duran in the head at a downward trajectory, killing her and ultimately killing her otherwise healthy fetus, which she had been carrying for 12 to 15 weeks.

Seba paused, then fired eight more shots. Five of Seba's shots hit Brandon Wright on the back of his body, leaving him lying on the property line about 20 feet from Seba's house and paralyzing him from the waist down. Immediately after the shooting, Seba made two phone calls. He called his father and told him that he had shot "a couple black guys." Seba also called a friend with whom he played online video games. He told his friend he had shot two guys and he was going to jail.

A law enforcement officer soon arrived at the scene. The officer found Seba outside his house with his hands above his head. Seba told the officer, who was approaching with his weapon drawn, "I'm the shooter. I'm the one that shot them." Seba told the officer he had been attacked by two men who pulled a gun on him, and he also told the officer he left the .22 rifle in the yard. Although the officer noticed an odor of alcohol about Seba, Seba was coherent, easy to understand, and could walk on his own. A blood draw just over 2 hours later revealed Seba's blood-alcohol concentration to be

8

.17 grams per 100 milliliters of blood, which could have been higher or lower than it was at the time of the shooting, depending on unknown absorption and elimination rates.

Seba gave investigators two interviews at the station. During the first interview, which occurred at 2:24 the morning after the shooting, Seba told investigators the fight started because Rost owed him money for a video game. He said a group came over from Rost's apartment and pulled him off his porch. He was able to escape into his house, run up his stairs, get his .22 competition rifle out of its case, and charge it as he came back downstairs. The group of men pulled him onto his porch. He said something like, "Attack me now, nigger," and the group pulled him off his porch for the second time. He said he shot at them to try to get them off of him. He also explained to investigators that he had repeatedly used the "N word" to try to get everybody riled up.

Upon further investigation, Seba's initial story did not line up with the physical evidence. More than 24 hours later—after Seba's family had told him about Duran's death—Seba agreed to a second interview. Remorseful, Seba said his first statement to investigators was "bullshit." He again told investigators the altercation began with Rost and the video game, and he now said he remembered a group coming to his house after he kicked Foreman and Rost's door. He also recounted getting pushed down and kicked and then fleeing into his house to get his gun.

Seba could not explain why he came back outside. He admitted he had not been pulled off the porch when he came back from getting his gun. When questioned, Seba said it was "hard to remember most of it 'cause [he] was so drunk." He said he "wasn't thinking" but was upset with the Wrights and he was "just trying to scare them." He thought he was aiming above them. He saw that the second person he shot was facing away from him when he shot. Weeping, Seba told investigators that he could not stop

9

"seeing pictures of that girl falling down." From what he could remember, Duran was trying to help him, and she was shot because she happened to be standing next to Brandon Wright.

After a jury trial, the district court instructed the jury that it could find Seba not guilty; guilty as charged—that is, guilty of first-degree premeditated murder of Duran, first-degree premeditated murder under Alexa's law, and attempted first-degree premeditated murder of Brandon Wright; or guilty of lesser included offenses. The jury found Seba guilty as charged. The district court imposed sentences totaling 50 years: two consecutive life sentences for Seba's two first-degree premeditated murder convictions and a 272-month concurrent sentence for attempted first-degree premeditated murder. Seba appealed to this court, and jurisdiction is proper under K.S.A. 2015 Supp. 22-3601(b)(3) (direct appeal to supreme court when life sentence imposed).

ANALYSIS

Seba raises seven arguments, which we have taken the liberty of reordering. We will begin our analysis with Seba's issue regarding transferred intent, which he phrases as both a sufficiency issue and a jury instruction error. We will then address his other instruction errors, his claim the district court erred in admitting some autopsy photographs, and, finally, his claim that cumulative error denied him a fair trial.

Seba raises all of his jury instruction issues for the first time on appeal. Consequently, we apply the same standard of review to each of these claims. Under that standard, we first review de novo whether the complained-of jury instruction was legally and factually appropriate. *State v. Williams*, 295 Kan. 506, Syl. ¶ 4, 286 P.3d 195 (2012). If the court erred by (1) giving an instruction that was not legally or factually appropriate, or (2) not giving an instruction that was legally and factually appropriate, we then

10

determine whether the error was harmless. 295 Kan. at 510. Where instruction errors are raised for the first time on appeal, as here, the district court's failure to give a legally and factually appropriate instruction will result in reversal only if the failure was clearly erroneous. K.S.A. 2015 Supp. 22-3414(3); *State v. Breeden*, 297 Kan. 567, 581, 304 P.3d 660 (2013). To establish such clear error, Seba must firmly convince us the jury would have reached a different result without the error. *Williams*, 295 Kan. at 516.

ISSUE 1: *The evidence was sufficient to support the jury finding that Seba possessed the requisite intent, and the district court did not err in providing the jury with instructions on transferred intent.*

We first consider Seba's argument that the evidence was insufficient to prove the intent element of either first-degree premediated murder count and that the district court erred in instructing the jury on the State's theory that Seba's intent could be proven through the transferred intent doctrine. Seba does not contend the instructions misstated the transferred intent doctrine; rather, he contends the doctrine was not legally and factually appropriate under the facts of this case and that without the doctrine there is insufficient evidence to establish first-degree premeditated murder.

We review the sufficiency of the evidence in the light most favorable to the State and determine whether a rational factfinder could have found the defendant guilty beyond a reasonable doubt. This review does not involve reweighing the evidence, assessing the credibility of witnesses, or resolving conflicts in the evidence. *State v. Bolze-Sann*, 302 Kan. 198, 203, 352 P.3d 511 (2015).

To frame this issue, we begin with K.S.A. 2015 Supp. 21-5402(a), which defines murder in the first degree as "the killing of a human being committed:  (1) Intentionally, and with premeditation." The jury was properly instructed that to prove premeditation the State had to show Seba had "thought the matter over beforehand, in other words, [had]

11

formed the design or intent to kill before the act." See PIK Crim. 4th 54.150(d) (2013 Supp.). The State relied on the transferred intent doctrine to prove Seba acted intentionally and with premeditation.

This court has previously explained the transferred intent doctrine by stating:

"The fact that the homicidal act was directed against one other than the person killed does not relieve the slayer of criminal responsibility. It is generally held that such a homicide partakes of the quality of the original act, so that the guilt of the perpetrator of the crime is exactly what it would have been had the assault followed upon the intended victim instead of another." *State v. Moffitt*, 199 Kan. 514, 535, 431 P.2d 879 (1967), *overruled on other grounds by State v. Underwood*, 228 Kan. 294, 306, 615 P.2d 153 (1980).

More plainly stated, "'"the malice or intent follows the bullet." 40 Am. Jur. 2d, Homicide § 11, pp. 302-03.'" *State v. Jones*, 257 Kan. 856, 860, 896 P.2d 1077 (1995); see *State v. Garza*, 259 Kan. 826, 829, 916 P.2d 9 (1996) (same).

Seba presents several arguments regarding the application of transferred intent in this case. In one argument aimed at establishing the instruction was not legally appropriate, Seba briefly and unpersuasively argues felony murder is the only charge available because the legislature has statutorily codified felony murder but not the transferred intent doctrine. He suggests felony murder applies because Seba's attempt to kill Brandon Wright constituted an inherently dangerous felony and the two charged first-degree murder counts resulted from his actions during the commission of that felony. See K.S.A. 2015 Supp. 21-5402 (defining murder in the first degree to include premeditated murder and "the killing of a human being committed . . . in the commission of . . . any inherently dangerous felony").

12

Seba is correct that the concept of transferred intent developed at common law and, while it "is an accepted principle in the courts of this state," it has not been codified. *Jones*, 257 Kan. at 859; see *Moffitt*, 199 Kan. at 535; see also Prosser, *Transferred Intent*, 45 Tex. L. Rev. 650, 652-53 (1967) (discussing common-law origins of transferred intent doctrine in England and carryover to the United States). Seba then supports his argument that felony murder must serve as the State's theory of prosecution by citing *Moffitt*, 199 Kan. at 529-30, for its statement that "where any [definitions of murder and manslaughter at common law] are not in accord with our statutory provisions the latter must control." But Seba fails to point out how the transferred intent doctrine is not in accord with Kansas' first-degree murder statute.

Although not considering this exact argument, we have recognized that sometimes the same evidence can support either a felony-murder conviction or a premeditated murder conviction based on transferred intent. *Jones*, 257 Kan. at 870 ("[P]recisely the same evidence supports the charge of first-degree felony murder" and the premeditated murder charge "[u]nder the transferred intent theory . . . . Not being able to determine from the general verdict form on which theory the jury based its verdict, therefore, is immaterial."). This conclusion stands at odds with Seba's contention, although the *Jones* decision did not specifically address the issue raised by Seba. But other courts have. One example is *Gladden v. State*, 273 Md. 383, 330 A.2d 176 (1974).

In *Gladden*, a Maryland appellate court considered whether the transferred intent doctrine should be applied to a charge brought under Maryland's premeditated murder statute. The Maryland court first extensively discussed the common-law history of the transferred intent doctrine and its application in the United States. It recognized the doctrine in the same words used by this court in *Jones*, words taken from 40 Am. Jur. 2d,

13

Homicide § 11, pp. 302-03. *Gladden*, 273 Md. at 392-93. The court rejected the possibility that the codification of the elements of murder required abandonment of the transferred intent doctrine, concluding "its viability is recognized by its current acceptance and application." 273 Md. at 392.

To make its point, the Maryland court noted the large number of states that apply the transferred intent doctrine as a means to prove statutory premeditated murder. But it also noted that a handful of states do not (or at some point in their history did not) recognize the doctrine. 273 Md. at 393-400. For example, although Montana has since amended its murder statute, in 1918 the Montana Supreme Court "held that the killing of one person undesignedly in the attempt to murder another, although not a guiltless homicide, was not murder in the first degree since under the Montana statute it was necessary to show 'the deliberate premeditated design specifically to kill the person who was killed.'" 273 Md. at 398 (quoting *State v. Caterni*, 54 Mont. 456, 171 P. 284, 285 [1918]). In contrast, many states with statutory provisions similar to Kansas'—*i.e.*, defining the crime as "the killing of a human being" and without limitation to a specific victim—applied the transferred intent doctrine to premeditated murder. 273 Md. at 394. To read a statute like Kansas' to have the same meaning as the 1918 Montana statute, a reading favored by the Maryland defendant and Seba, "would necessitate the engrafting of an ingredient that such homicide must be committed 'with malice aforethought against the deceased'—an element never required under the common law." 273 Md. at 403.

As the *Gladden* court's reasoning suggests, the transferred intent doctrine does not create a different crime than the statutorily defined crime of first-degree premeditated murder. Nor does it alter a statutory provision. As did the Maryland court, we fail to see anything in Kansas' first-degree premeditated murder provision that conflicts with the transferred intent doctrine. See K.S.A. 2015 Supp. 21-5402(a)(1).

Nor do we find a conflict between the transferred intent doctrine and the felony-murder statutory provisions. Rather, consistent with our holding in *Jones*, premeditated murder proven through the transferred intent doctrine can coexist with felony murder as an alternative theory for proving first-degree murder—just as the first-degree murder statute envisions. *Jones*, 257 Kan. at 870; see *State v. Thomas*, 302 Kan. 440, Syl. ¶ 1, 353 P.3d 1134 (2015) ("Premeditated and felony murder are not separate and distinct offenses, but rather they are two theories under which the crime of first-degree murder may be committed."). Again, the Maryland court explained some concepts that lead to this conclusion.

The transferred intent doctrine and the felony-murder rule "had a common origin under the common law," and "[i]n homicide cases . . . the doctrine of 'transferred intent' performs a function equivalent to that applied under the felony-murder rule"—that is, both provide a method of proving the state of mind element of first-degree murder. *Gladden*, 273 Md. at 403-04; see also *State v. Gayden*, 259 Kan. 69, 76-78, 910 P.2d 826 (1996). As this court explained in *Gayden*, while both theories transfer intent, they differ with respect to the nature of the intent that transfers.

A typical first-degree murder charge based on the theory of transferred intent occurs when A tries to kill B but actually kills C. A's intent—the homicidal intent—to kill B transfers to C, making A guilty of first-degree murder even though A did not intend the specific victim. Felony murder, in contrast, transfers the intent to commit an inherently dangerous felony to an unintended death that occurs during the commission of the underlying felony. It is felonious intent, rather than homicidal intent, that provides the malice and intent required for a first-degree felony-murder conviction. See 259 Kan. at 76-78. In some cases, the felonious intent to commit an inherently dangerous felony may

15

be a homicidal intent—*i.e.*, the two theories may overlap. But often there will not be an overlap—the felonious intent to commit an inherently dangerous felony will not be an intent to commit a homicide.

Overlap does not equate to conflict. In *Gayden*, we specifically rejected an argument that the transferred intent doctrine conflicted with first-degree felony murder under the facts of that case, stating:

> "What defendant postulates is a conflict between the legal doctrines of transferred intent and felony murder in the circumstances of his case. A review of application of the felony-murder principle by this court and relevant statutory provisions leads to the conclusion that there is no such conflict and thus no merit to defendant's argument." 259 Kan. at 75.

Further, contrary to Seba's argument, this court's holding in *Gayden* does not mean that only a felony-murder conviction can stand when the one murdered is not the intended victim. Seba tries to pull too much from *Gayden*, as this court did not decide whether felony murder was the only charge available when a defendant intends to cause the death of one person but misfires and causes the death of an unintended victim.

In *Gayden*, Lafayette Gayden shot at a man in a bar and in the process killed a bystander. The State charged Gayden with attempted first-degree murder as to his intended target. The jury, however, received an instruction on the lesser included offense of attempted voluntary manslaughter and convicted Gayden of this lesser offense. The State charged Gayden with felony murder for the bystander's death. The jury received instructions on both felony murder and transferred intent, and the jury convicted Gayden of felony murder.

16

On appeal, Gayden claimed this court should reverse his felony-murder conviction. He premised his argument on the following logic: The jury convicted him of attempted voluntary manslaughter of the intended target rather than attempted first-degree murder. See K.S.A. 2015 Supp. 21-5404(a) (voluntary manslaughter is "knowingly killing a human being . . . [u]pon a sudden quarrel or in the heat of passion"). So, because the jury believed Gayden's intent to kill was not sufficient for first-degree murder, that same intent—which arguably transferred to the bystander—should not have been enough to justify the first-degree felony-murder conviction. This court disagreed and explained the difference between the intent that transfers for first-degree intentional murder and the intent that transfers for first-degree felony murder. Notwithstanding the lack of a premeditated intent to kill, Gayden's intent to commit the attempted voluntary manslaughter—an inherently dangerous felony—was legally sufficient to support his first-degree felony-murder conviction. 259 Kan. at 76-79.

This case does not present the same problem as that faced in *Gayden*. Rather than some lesser offense, the jury convicted Seba of the attempted first-degree murder of Brandon Wright. Likewise, there is not an issue here with something less than homicidal intent being transferred, and *Gayden* provides little support for Seba's argument.

As the Maryland court explained in *Gladden*, if the defendant acts with a premeditated intent to kill, "[t]he purpose and malice with which the shots were fired are not changed in any degree by circumstances showing that they did not take effect—because of bad aim—upon [the intended victim]." *Gladden*, 273 Md. at 404-05. In such a circumstance, the defendant's "culpability under the law and the resultant harm to society [are] the same as if he had accomplished the result he intended when he caused the death of the [unintended victim]." 273 Md. at 405. In other words, the defendant's culpability is the same, even if a shot misses the intended target.

17

Thus, if Seba's state of mind involved an intent to kill and premeditation, it is not inconsistent with Kansas statutes for him to be convicted of first-degree premeditated murder under the transferred intent doctrine. The transferred intent doctrine does not offend K.S.A. 2015 Supp. 21-5402, Kansas' first-degree murder statute. Rather, the doctrine merely clarifies that evidence of a defendant's intent to kill a particular person can prove intent to kill a human being even if a person other than the intended victim is murdered at the defendant's hands.

In addition to these overarching objections to the use of transferred intent to both first-degree premeditated murder convictions, Seba presents several reasons the transferred intent doctrine cannot support his Alexa's law conviction. Before discussing the specifics of those arguments, we return to the statutory provisions of what is known as Alexa's law, found in K.S.A. 2015 Supp. 21-5419. The statute provides that for some crimes, including murder as defined in K.S.A. 2015 Supp. 21-5402, "'human being' also mean[s] an unborn child." K.S.A. 2015 Supp. 21-5419(c). An "'unborn child' means a living individual organism of the species homo sapiens, in utero, at any stage of gestation from fertilization to birth." K.S.A. 2015 Supp. 21-5419(a)(2). Through Alexa's law, the legislature expressed an intent to allow two units of criminal prosecution if one act—such as shooting one bullet—kills both a woman and her "unborn child." See *State v. Schoonover*, 281 Kan. 453, 472, 133 P.3d 48 (2006) ("The unit of prosecution was determined by the scope of the course of conduct defined by the statute rather than the discrete physical acts making up that course of conduct or the number of victims injured by the conduct."). The parties do not discuss the implications of this legislative intent and the effect it might have on the proof of the criminal intent needed to support an Alexa's law conviction. We, therefore, will also leave that discussion to another day.

Instead, Seba, in arguing his Alexa's law conviction cannot rest on the same transferred intent theory as does the premeditated murder of Duran, contends the State "claimed that Mr. Seba deliberately shot a human being, who was Duran—she was the intended victim and she was killed." He further argues that once she was killed the act was completed and the intent could not be transferred. In other words, according to Seba, his intent to kill Duran was realized by her death and there was no intent left to transfer. Thus there can be no Alexa's law conviction.

Seba's argument contains both legal and factual components. The legal component—whether the transferred intent doctrine can be used to establish premeditated murder when the intended target is killed in addition to an unintended target—finds some support in caselaw from other jurisdictions, but courts do not agree on the point. Compare *United States v. Sampol*, 636 F.2d 621, 674 (D.C. Cir. 1980) ("There are even stronger grounds for applying the [transferred intent] principle where the intended victim is killed by the same act that kills the unintended victim."), with *People v. Birreuta*, 162 Cal. App. 3d 454, 460, 208 Cal. Rptr. 635 (1984) ("When the intended victim is killed . . . there is no need for such an artificial doctrine [as transferred intent]. The defendant's premeditation, deliberation, intent to kill and malice aforethought are all directly employable in the prosecution for murdering his intended victim. The accidental killing may thus be prosecuted as a manslaughter or second degree murder.").

We need not determine which line of cases we would apply, however, because the facts and procedural history of this case do not support Seba's argument. The jury heard evidence that Seba told the Wright brothers, "I'm going to kill you motherfuckers," as he went into his house to retrieve his firearm. He also stated during his second interview that he believed Duran was trying to help him and she just happened to be standing by Brandon Wright. While he was "pretty mad" because the Wrights had "taunt[ed]" him, he

19

was not upset with Duran. Moreover, he did not "think anything they did to me should have caused that, should have caused that girl to die." Also, the fact Seba fired eight shots after Duran fell to the ground—five of which hit one of the men with whom he had fought—provides further evidence she was not the intended target or at least not the only intended target. And he told his father he thought he had shot two black men. Overall, these facts indicate the Wright brothers, not Duran, were the intended victims, and Seba does not cite any facts to support a contrary view.

Instead Seba relies on a single statement taken out of context from the State's closing argument. Before this statement, the State emphasized facts to the jury that pointed to the Wright brothers as the intended victims. For example, the prosecutor stated while explaining the concept of transferred intent:

> "[T]he intent follows the bullet. That bullet, whatever the intent was, follows the bullet, whatever it hits. So did the defendant desire to kill the intended victim before pulling the trigger? He called up his dad immediately after and said I shot two black guys—said I think I shot two black guys."

The prosecutor continued with similar statements and, overall, conveyed to the jury the State's theory that the two black guys—the Wright brothers—were the intended victims.

Without mentioning this context, Seba cites a statement that appears in the trial transcript six pages after the prosecutor's discussion of transferred intent. At that point the prosecutor explained that the "unborn child died because . . . of the bullet that was put in [Duran's] head by the defendant, she could not pump the blood and provide the oxygen to that unborn child that was needed for life." The prosecutor continued with the question, "So does this unborn child count?" He then explained that under Kansas' Alexa's law the

20

death did count and that the jury should recall a witness' explanation of how the terms used in the statutory definition of "unborn child" applied in Seba's case.

Then the prosecutor made the statement on which Seba focuses: "[I]f Alexandria Duran was killed, murdered in the first degree, premeditation, then so was her unborn child." In context, this statement did not shift the State's theory of transferred intent so as to suggest that Duran was an intended target. Rather, the State's point was that Alexa's law allowed the State to prosecute the Alexa's law murder and that the same facts supporting a conviction for Duran's death—facts the prosecutor had discussed at length and included the explanation of transferred intent quoted above—supported a conviction on the Alexa's law charge as well.

Indeed, factually, nothing distinguishes the state of mind element (or any other element) of the two first-degree premeditated murder counts. Nothing suggests Seba intended to cause either death, and both counts depend on Seba's intent to kill the Wright brothers transferring to the bystander and her unborn child. In other words, the prosecutor made a factually accurate statement when he equated the intent relating to both counts.

Even if there is ambiguity in the State's argument, the district court instructed the jury regarding transferred intent in a way that conveyed to the jury that someone other than Duran was the intended victim. The court repeated the pattern instruction on transferred intent in its instruction regarding the first-degree premeditated murder count relating to Duran and in each lesser included offense instruction relating to that count. The pattern instruction reads: "When a homicidal act is directed against one other than the person killed, the responsibility of the actor is the same as it would have been had the act been completed against the intended victim." PIK Crim. 4th 54.160 (2014 Supp.). The words "one other than the person killed" informed the jury of the State's theory that the

homicidal act had been directed at someone other than Duran. Similarly, in the elements instruction regarding the premeditated murder count under Alexa's law, the district court informed the jury of the transferred intent theory.

Thus, Seba's argument that Duran was the intended victim lacks factual support—in the evidence presented, in the arguments of the prosecutor, or in the instructions considered by the jury.

This does not dispose of Seba's arguments, however, because he also suggests that once Duran died his homicidal intent had been exhausted and could not transfer and support another premeditated murder charge. At oral argument, Seba's counsel asserted that intent thus is severed from the bullet once a death occurs and intent no longer follows the bullet. Providing an example, Seba's counsel argued that if one person stands directly behind another and one bullet passes through the first person and hits the second, killing both, the intent to kill can only transfer to the first victim; the second count must be for felony murder.

Seba cites to the wording of Kansas' pattern instruction on transferred intent for support. See PIK Crim. 4th 54.160 (2014 Supp.) ("When a homicidal act is directed against one other than the person killed, the responsibility of the actor is the same as it would have been had the act been completed against the intended victim."). Specifically, he focuses on the words in the instruction about a completed act. We reject his reading of the instruction for several reasons.

First, the PIK instruction does not read as Seba suggests. He essentially would leave off the final words of the instruction—"against the intended victim"—so that the transfer of intent would end as soon as a defendant's actions ended in a death, even if all

the individuals killed were bystanders and not the intended victim. When the phrase "against the intended victim" is added into the equation, the pattern instruction does not suggest the homicidal act is complete or its intent exhausted when those other than the intended target are killed; Seba's argument lacks grammatical support.

Second, even if we assume Seba's argument has merit, the transfer of intent directed at two or more intended victims could theoretically be transferred to two unintended victims. Under that theory the record in this case provides sufficient evidence to support Seba's first-degree premeditated murder convictions. In particular, statements by Seba during the altercation and to law enforcement officers after the fact reveal evidence sufficient to support two first-degree premeditated convictions based on the transfer of intent. The evidence, when considered in the light most favorable to the State, could lead a reasonable jury to conclude Seba intended to kill two individuals: His threat to kill "you motherfuckers" was aimed at both Wright brothers; he shot one person and when that person fell he shot eight more times, hitting the second person with five shots; and he reported he had shot two black men—his two intended targets.

Hence, we reject Seba's arguments that the Alexa's law count could only rest on a theory of first-degree felony murder. The district court properly instructed the jury on transferred intent for a charge of premeditated first-degree murder for both the count relating to Duran and the Alexa's law count. We also rule that sufficient evidence supports the jury's determination that Seba was guilty of both counts of first-degree premeditated murder.

ISSUE 2: *The district court's failure to instruct on reckless second-degree murder and reckless involuntary manslaughter was harmless.*

We next address whether the district court erred by failing to instruct the jury on reckless second-degree murder and reckless involuntary manslaughter. Seba did not request either instruction, so the clear error standard applies. K.S.A. 2015 Supp. 22-3414(3).

The State charged Seba with an intentional and premeditated murder, but if the district court had given the jury an instruction on the two lesser included offenses now suggested by Seba, the jury could have considered whether he acted recklessly instead of intentionally.

The distinction between the crimes charged and the requested instructions is, at the core, the intent to kill. See K.S.A. 2015 Supp. 21-5403(a)(2) (reckless second-degree murder is a killing done "unintentionally but recklessly under circumstances manifesting extreme indifference to the value of human life"); K.S.A. 2015 Supp. 21-5405(a)(1) (defining reckless involuntary manslaughter as "the killing of a human being committed . . . [r]ecklessly"); *State v. Deal*, 293 Kan. 872, 882, 269 P.3d 1282 (2012). A person acts recklessly by "consciously disregard[ing] a substantial and unjustifiable risk that circumstances exist or that a result will follow, and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation." K.S.A. 2015 Supp. 21-5202(j).

Clearly, a lesser included offense instruction on reckless second-degree murder would have been legally appropriate because "[r]eckless second-degree murder is a lesser included offense of premeditated first-degree murder." *State v. Martinez*, 288 Kan. 443, 453, 204 P.3d 601 (2009). A lesser included offense instruction on reckless involuntary

24

manslaughter would also have been legally appropriate, as it is a lesser included offense of first-degree murder and second-degree murder. See *State v. Engelhardt*, 280 Kan. 113, 135, 119 P.3d 1148 (2005) (reckless involuntary manslaughter differs from reckless second-degree murder "only in the degree of recklessness required to prove culpability").

The closer question is whether a reckless second-degree murder instruction was factually appropriate. "[L]esser included offense instructions must be given when there is some evidence, [viewed in a light most favorable to the defendant,] emanating from whatever source and proffered by whichever party, that would reasonably justify a conviction of some lesser included crime." *State v. Rodriguez*, 295 Kan. 1146, 1152, 289 P.3d 85 (2012); see K.S.A. 2015 Supp. 22-3414(3); see also *State v. Kershaw*, 302 Kan. 772, 775, 359 P.3d 52 (2015).

This court has stated that "[t]he unsupported testimony of the defendant alone, if tending to establish such lesser degree, is sufficient to require the court to so instruct." *State v. Clark*, 261 Kan. 460, 464, 931 P.2d 664 (1997). But we have also held that when evidence is overwhelming, a defendant's "self-serving statement regarding his lack of intent did not in itself invoke a duty on the trial judge to instruct on recklessness." *State v. Calderon*, 270 Kan. 241, 256, 13 P.3d 871 (2000). In other words, whether an otherwise unsupported and self-serving statement of intent compels a lesser included offense instruction depends on the extent to which the other evidence repudiates the statement.

Here, Seba presents two factual circumstances he contends would have supported a jury concluding he acted recklessly. First, he points to evidence of his intoxication. Second, he relies on evidence that he shot above the crowd.

25

As to Seba's intoxication argument, we note that the district court instructed the jury that voluntary intoxication could negate the intent required for first-degree murder. We presume the jury properly considered and rejected the idea that Seba's intoxication negated his intent to kill, and we do not reweigh evidence. See *State v. Kettler*, 299 Kan. 448, 466, 325 P.3d 1075 (2014) ("Appellate courts do not reweigh evidence."); *State v. Rogers*, 276 Kan. 497, 503, 78 P.3d 793 (2003) ("As a general rule, juries are presumed to have followed instructions given by the trial court."). Seba does not present a firmly convincing argument as to why an instruction on reckless second-degree murder would have, on its own, caused the jury to change its assessment and believe Seba's intoxication was somehow sufficient to negate his intent to kill.

Regarding his second argument, Seba points to a recording heard by the jury. In that recording of Seba's second interview with law enforcement, he indicated he was aiming above the group of people when he fired in an attempt to scare them. The State counters by arguing that a reckless second-degree murder instruction was not factually appropriate. It cites two cases for support—*State v. Perez*, 294 Kan. 38, 261 P.3d 532 (2012), and *State v. Clark*, 261 Kan. 460, 931 P.2d 664 (1997). It also points to the physical evidence that counters Seba's assertion and argues the overwhelming evidence of intent and premeditation means the district court did not have a duty to instruct on reckless second-degree murder.

We need not resolve the dispute because even if we assume the district court erred in failing to provide an instruction on reckless second-degree murder or on reckless involuntary manslaughter, the error was harmless because Seba fails to firmly convince us the jury would have reached a different result without the error. *State v. Williams*, 295 Kan. 506, 516, 286 P.3d 195 (2012). Evidence of premeditation and an intent to kill was overwhelming. When Seba broke free from the Wright brothers he yelled something like,

"You are going to get shot, nigger." And he followed through with that threat. Seba ran into his house, up his stairs, and into a room where he retrieved a modified-for-accuracy .22 rifle from its case, charged it as he ran back down the stairs, exited the house onto his porch, and fired nine shots—at a downward trajectory—hitting Duran once in the head and Wright five times.

Seba did say he "imagined" he was "just trying to scare them" by trying to aim above them. But the sky is vast and hard to miss, and just under 67 percent of Seba's shots hit a person. Seba had been described as a good shot, and his repeated shots into the back of Wright's body suggests he was aiming at a specific point much lower than above the heads of the group. Considering the overwhelming evidence, we are not firmly convinced the jury would have found that Seba lacked the intent to kill had the jury received a reckless second-degree murder instruction.

ISSUE 3: *The definitional instruction for "intentionally" did not misstate the law.*

To be guilty of first-degree premeditated murder, a person must have intended to cause a particular result—death. K.S.A. 2015 Supp. 21-5402(a)(1); see *Deal*, 293 Kan. at 883-85. In another claim of instructional error, Seba argues the district court failed to instruct the jury on that requirement. Instead, Seba claims the instructions advised the jury that Seba was guilty of first-degree murder if he merely intended to perform an act that resulted in death. In other words, Seba claims the instructions might have confused the jury into believing that Seba was guilty of first-degree murder merely if he intended to fire the gun. We see no reason why the instruction here would have confused the jury.

PIK Crim. 4th 52.010 (2015 Supp.) provided the district court with a recommended model instruction defining "intentionally." See *State v. Franklin*, 264 Kan.

496, 505, 958 P.2d 611 (1998) (use of PIK instructions is recommended). This instruction contemplated two potential versions:

"A defendant acts intentionally when it is the defendant's desire or conscious objective to *insert one or more of the following as appropriate for the crime charged:*
- do the act complained about by the State.
  or
- cause the result complained about by the State." PIK Crim. 4th 52.010 (2015 Supp.).

See *State v. Hobbs*, 301 Kan. 203, 340 P.3d 1179 (2015).

Here, the district court's instruction on Count 1—the first-degree murder of Duran—read as follows:

"In Count 1, the Defendant is charged with murder in the first degree concerning Alexandria Duran. The Defendant pleads not guilty.

"To establish this charge, each of the following claims must be proved:
1. The Defendant intentionally killed Alexandria Duran.
2. The killing was done with premeditation.
3. This act occurred on or about the 24th day of July, 2013, in Pratt County, Kansas.

. . . .

"A defendant acts intentionally when it is the Defendant's desire or conscious objective *to do the act complained about by the State*." (Emphasis added.)

28

Additionally, the elements instructions with respect to the other victims used the same definition of intentionally (as did all lesser included offense instructions where the mental state required the defendant to act intentionally).

Seba contends that because the district court chose the version of PIK Crim. 4th 52.010 (2015 Supp.) with the language "do the act" instead of "cause the result," the jury believed it could find Seba guilty merely by believing he intended to fire the gun. But the "do the act" language accurately corresponded to the other language in the instruction.

Unquestionably, a first-degree premeditated murder conviction requires death to have been the intended result of an act. *Deal*, 293 Kan. at 883-85. And as the State points out, the language of the instructions only permitted the jury to convict Seba if it believed he intended to do a specific act, *i.e.*, kill. "Killing," as an act, necessarily requires a result—death. So Seba could not intend to kill without intending to cause death, meaning the instruction would not have confused the jury into believing that Seba was guilty merely if he intended to fire the gun. Perhaps the district court could have reworded the elements language to grammatically fit the "cause the result" PIK language. But the district court did not confuse the jury about the legal elements of first-degree premeditated murder with the PIK language it used to define "intentionally." Taken as a whole, the instruction properly informed the jury of the intent requirement, and we reject Seba's claim that the instruction was erroneous.

ISSUE 4: *The failure to instruct on imperfect self-defense voluntary manslaughter was not reversible error.*

Seba argues the district court erred by failing to provide an instruction on imperfect self-defense voluntary manslaughter. Again, we initially consider whether the instruction was legally and factually appropriate, which are questions subject to unlimited

review. *State v. Clay*, 300 Kan. 401, 408, 329 P.3d 484 (2014). As this claim involves a lesser included offense, we must view the evidence in the light most favorable to Seba to determine if a reasonable jury could have convicted him of the lesser offense. K.S.A. 2015 Supp. 22-3414(3); *State v. Rodriguez*, 295 Kan. 1146, 1152, 289 P.3d 85 (2012).

Imperfect self-defense voluntary manslaughter "is knowingly killing a human being . . . upon an unreasonable but honest belief that circumstances existed that justified use of deadly force [in defense of a person, in defense of a dwelling, or in defense of other property]." K.S.A. 2015 Supp. 21-5404(a)(2) (referencing K.S.A. 2015 Supp. 21-5222; K.S.A. 2015 Supp. 21-5223; K.S.A. 2015 Supp. 21-5225). This crime is a lesser included offense of first-degree intentional murder, and Seba's proposed instruction would have been legally appropriate. See *State v. Gallegos*, 286 Kan. 869, 874, 190 P.3d 226 (2008).

In arguing the instruction was factually appropriate, Seba focuses on his interviews by law enforcement officers in which he said he had been afraid. He specifically referenced his first interview, in which he said that he shot the victims after they pulled him out of his door, off his porch, and while they were attacking him. He argues these statements reveal a subjective belief he needed to defend himself. As these arguments related to Seba's claim of self-defense, the district court instructed the jury on perfect self-defense, but the jury rejected it.

As to imperfect self-defense, which focuses on the subjective beliefs of the defendant, even if we assume without analysis that the lesser included offense on imperfect self-defense voluntary manslaughter should have been given, Seba fails to firmly convince us the jury would have reached a different result without the error. *Williams*, 295 Kan. at 516.

All Seba can point to are an isolated statement that he was fearful and his retracted "bullshit" statements in his first interview. Yet, subjectively feeling fear is not sufficient to justify self-defense. As we clarified in *State v. Roeder*, 300 Kan. 901, Syl. ¶ 5, 336 P.3d 831 (2014), *cert. denied* 135 S. Ct. 2316 (2015), *reh'g denied* 136 S. Ct. 10 (2015): "An unreasonable but honest belief that circumstances existed that justified deadly force will not support a claim of imperfect [self-defense] unless the circumstances, if reasonably believed, would have supported a claim of perfect" self-defense under K.S.A. 2015 Supp. 21-5222.

Under K.S.A. 2015 Supp. 21-5222(b), deadly force can be justified only to the extent a person reasonably believes the "use of deadly force is necessary to prevent imminent death or great bodily harm to such person or a third person." Further, "the justification of self-defense 'is not available to a person who . . . initially provokes the use of force against himself' unless he or she has exhausted every means to escape from imminent danger or has communicated the good-faith intent to terminate the use of force." *State v. Knox*, 301 Kan. 671, 678, 347 P.3d 656 (2015); see *State v. Salary*, 301 Kan. 586, 594-95, 343 P.3d 1165 (2015); see also K.S.A. 2015 Supp. 21-5226(c).

As applied here, Seba admitted, even in the first interview, that he had been trying to provoke the men. And in Seba's second interview, he told investigators that everything his said in the first interview was "bullshit." He did not indicate he believed anyone else had a gun. No one pulled him out of his house. He shot at a group of people standing 20 feet away near the border of his property—facing away from him. He was not being attacked when he fired the shots. As to his subjective beliefs, he said he did not know why he shot at them; he thought maybe it was because the Wrights had threatened him before or maybe because he was mad and trying to get back at them for taunting him.

31

Further, the evidence at trial showed Seba broke free and escaped into his house after the physical confrontation between him and the Wright brothers in the yard. He was not followed, and he chose to return to the scene of the confrontation with a gun. The men who had accompanied Brandon Wright were already fleeing the scene before Seba's first shot. Seba himself said he "would not have c[o]me back out" if he would have known Duran would be shot. That concession, that there was no need for him to return to his porch, undercut any inference that he subjectively believed he had to use deadly force to protect himself or his property.

The evidence, including Seba's admissions, shows that Seba understood he could have entirely avoided the second confrontation. See *Salary*, 301 Kan. at 597 ("[L]eaving a confrontation with an individual and then returning with a loaded firearm and shooting that same person . . . typically [renders a person] ineligible for a self-defense instruction" under Kansas caselaw.); *State v. Harris*, 293 Kan. 798, 805, 269 P.3d 820 (2012) ("To warrant a voluntary manslaughter instruction . . . there needed to be evidence showing . . . an honest belief deadly force was necessary.").

In other words, even assuming Seba should have been given a lesser included offense instruction on imperfect self-defense voluntary manslaughter the evidence provided little support for a finding that Seba subjectively believed he needed to shoot his victims. In light of the overwhelming evidence of intent and premeditation, including Seba's own admission that he could have avoided everything by staying inside his house, Seba fails to present a firmly convincing argument that the jury's verdict would have been different had it received such an instruction. Thus, even assuming the district court erred by not giving the instruction, Seba fails to convince us the jury would have reached a different result without the error. See *Williams*, 295 Kan. at 516.

ISSUE 5: *The district court correctly instructed the jury that voluntary intoxication was not a defense to voluntary manslaughter.*

The district court instructed the jury that voluntary intoxication was a defense to the charges of first-degree premeditated murder, second-degree intentional murder, attempted premeditated murder, and attempted intentional murder if "such intoxication impaired the Defendant's mental faculties to the extent that he was incapable of forming the necessary intent to kill or the necessary premeditation." The jury rejected the defense. Now, for the first time on appeal, Seba complains about the last portion of the voluntary intoxication instruction in which the district court told the jury voluntary intoxication was not a defense to the lesser included offenses of voluntary manslaughter and attempted voluntary manslaughter.

Seba argues that the voluntary intoxication instruction misstated the law, which presents an issue subject to unlimited review. See *State v. Barber*, 302 Kan. 367, 377, 353 P.3d 1108 (2015) (an instruction that does not accurately state the law is error). Focusing first on the thrust of Seba's argument, we find the instruction did not misstate the law as to voluntary manslaughter.

"'[V]oluntary intoxication is not a defense to general intent crimes, [although it] may be used to negate the intent element of a specific intent crime.'" *State v. Hilt*, 299 Kan. 176, 192, 322 P.3d 367 (2014) (quoting *State v. Brown*, 291 Kan. 646, 654, 244 P.3d 267 [2011]). Typically, a general intent crime does not require the State to prove the defendant intended the specific harm or result. *In re C.P.W.*, 289 Kan. 448, 454, 213 P.3d 413 (2009). The legislature has designated crimes with a mental culpability requirement of "'knowingly,' known,' or 'with knowledge' [as] general intent crimes." K.S.A. 2015 Supp. 21-5202(i). This court recently held that "the legislature's designation of a general

33

intent mental culpability requirement where a crime is defined by the term 'knowingly' continues to express a legislative intent that a voluntary intoxication defense is unavailable for that crime." *State v. Kershaw*, 302 Kan. 772, 782, 359 P.3d 52 (2015).

Voluntary manslaughter is "*knowingly* killing a human being . . . in the heat of passion." (Emphasis added.) K.S.A. 2015 Supp. 21-5404(a)(1). Because the legislature determined voluntary manslaughter required a knowing mental state—meaning voluntary manslaughter is a general intent crime—voluntary intoxication was not legally available as a defense. *Kershaw*, 302 Kan. at 782. Thus, the district court committed no error in instructing the jury that "[v]oluntary intoxication is not a defense to the charge[] of voluntary manslaughter."

Seba's argument to the contrary misplaces reliance on *State v. Hobbs*, 301 Kan. 203, 340 P.3d 1179 (2015). In *Hobbs*, this court reviewed a Court of Appeals decision that raised the question of whether a conviction for aggravated battery required the State to prove that a defendant knew both the nature of the act taken and the nature of its result, *i.e.*, knew that great bodily harm would result from an act. 301 Kan. at 209-11. The Court of Appeals had concluded that aggravated battery was a general intent crime, so evidence that a defendant knew great bodily harm would be the result was irrelevant. 301 Kan. at 206; see also *In re C.P.W.*, 289 Kan. at 454 (the State does not need to prove knowledge of result for general intent crimes).

While the Court of Appeals' holding might have been the past approach to general intent crimes, based on new statutory language this court disagreed with that holding. Although the legislature designated "knowing" crimes as ones of general intent, the legislature also clarified that if a crime's definition "'prescribes a culpable mental state that is sufficient for the commission of a crime, without distinguishing among the

34

material elements thereof, such provision shall apply to all the material elements of the crime.'" *Hobbs*, 301 Kan. at 209-10 (quoting K.S.A. 2011 Supp. 21-5202). And because the aggravated battery statute prescribed a "knowing" mental state but did not distinguish among the material elements of the crime, the State had to prove "knowing" as to both elements—knowledge of the act and knowledge of the result. Thus, this court concluded in *Hobbs* that "the legislature does not intend for 'general intent' to necessarily mean what it once did." 301 Kan. at 210-11; see *Kershaw*, 302 Kan. at 781. Notwithstanding, this court did not overrule precedent concerning the voluntary intoxication defense or expand the intoxication defense beyond specific intent offenses. See *Kershaw*, 302 Kan. at 781-82 (recognizing *Hobbs*, but holding "[v]oluntary intoxication is not a defense to the prosecution of a general intent crime").

Because the legislature determined voluntary manslaughter required a knowing mental state—meaning voluntary manslaughter is a general intent crime—voluntary intoxication is not legally available as a defense. Thus, the district court committed no error in instructing the jury of that legal point.

In addition, Seba makes a passing reference in his argument to attempted voluntary manslaughter. The State gives Seba the benefit of this brief reference and concedes the district court erred in not including attempted voluntary manslaughter in the listing of lesser included crimes to which the defense might apply.

Accepting without analyzing the State's concession, Seba nevertheless fails to present a firmly convincing argument that the jury would have returned a different verdict had the district court instructed the jury that voluntary intoxication was a defense to attempted voluntary manslaughter. Hence, the error was harmless. See *State v. Clay*, 300 Kan. 401, 408, 329 P.3d 484 (2014). Again, evidence of intent and premeditation

was overwhelming in this case. And based on that evidence, the jury convicted Seba of two counts of first-degree murder and one count of attempted first-degree murder. Because the jury disregarded Seba's intoxication and relied on overwhelming evidence to convict him of crimes requiring intent and premeditation (rejecting the lesser offenses of intentional second-degree murder), it would not have mattered to the jury whether voluntary intoxication was potentially a defense to the still lesser crime of attempted voluntary manslaughter. See *State v. Williams*, 303 Kan. 585, 599-600, 363 P.3d 1101 (2016) ("'When a lesser included offense has been the subject of an instruction, and the jury convicts of the greater offense, error resulting from failure to give an instruction on another still lesser included offense'" can be deemed harmless.).

ISSUE 6: *The district court did not abuse its discretion by admitting autopsy photographs.*

At trial, Seba objected to a photograph showing Duran's brain and the trajectory of the bullet through it and to photographs Seba refers to as "fetus photographs" shown after the coroner testified, as summarized in Seba's brief, "that the death of the fetus 'was due to the death of the mother.'" Seba argues the photographs lacked relevancy, were prejudicial, and were cumulative of other evidence.

When considering an issue challenging a district court's decision to admit photographs into evidence, an appellate court must first determine whether the photos are relevant. *State v. Riojas*, 288 Kan. 379, 387, 204 P.3d 578 (2009). Evidence is relevant, and thus meets a threshold test for admissibility, if it has "any tendency in reason to prove any material fact." K.S.A. 60-401(b). Nevertheless, even relevant evidence can be inadmissible if the risk of unfair prejudice substantially outweighs the evidence's probative value. *State v. Cavaness*, 278 Kan. 469, 478, 101 P.3d 717 (2004). "If a party

argued that the photographs are overly repetitious, gruesome, or inflammatory, that is to say, prejudicial, the standard of review is abuse of discretion." *Riojas*, 288 Kan. at 387.

Regarding the first question of relevance, the district court soundly determined the photographs were relevant because autopsy photographs demonstrating the fact and manner of death are relevant and admissible "even if the cause of death is not contested." *State v. Warledo*, 286 Kan. 927, 946, 190 P.3d 937 (2008). Moreover, photographs are relevant if they show the "extent, nature, and number of wounds inflicted" or if the photographs assist the pathologist in explaining the cause of death. *Riojas*, 288 Kan. at 387. The State presented one photograph of Duran's brain, which corroborated the coroner's testimony that one bullet travelled through Duran's brain at a downward trajectory—a fact bearing on Seba's self-defense claims. All of the complained-of photographs corroborated the coroner's testimony regarding the cause of the deaths supporting both counts—facts the State sought to prove as to both first-degree murder charges. We, therefore, conclude the district court did not err in finding the photographs relevant.

Seba claims the photographs were nonetheless inadmissible because they were "gruesome" and "undoubtedly caused anger and resentment towards Mr. Seba." While most would describe the photographs as gruesome, that alone does not render the photographs inadmissible. "'Gruesome crimes result in gruesome photographs,'" but accurate representations of a crime typically do not unduly prejudice a defendant. *State v. Hernandez*, 284 Kan. 74, 100, 159 P.3d 950 (2007). Here, Seba does not contend the photographs were inaccurate and we do not find they were unduly prejudicial.

Finally, as to the cumulative nature of the photographs, Seba cites to an unpublished Court of Appeals decision, *State v. Glassburn-Hoesli*, No. 89,441, 2004

37

WL 48175 (Kan. App. 2004) (unpublished opinion), *rev. denied* 278 Kan. 849 (2004), and claims that "where a party is able to describe the subject matter of photographs, the photographs have 'little additional relevance' and should be excluded." Notwithstanding that an unpublished opinion from the Court of Appeals has limited precedential value, Seba mischaracterizes the holding in *Glassburn-Hoesli*. See Supreme Court Rule 7.04(g) (2015 Kan. Ct. R. Annot. 64). There, the Court of Appeals simply held that the district court did not abuse its discretion in *excluding* photographs that added little to the case—the court did not hold that photographs with little additional relevance *must* be excluded. 2004 WL 48175, at *3.

Just as the district court in *Glassburn-Hoesli* did not abuse its discretion with its evidentiary ruling excluding photographs, the district court here did not abuse its discretion with its evidentiary ruling admitting relevant photographs.

ISSUE 7: *The cumulative effect of trial errors did not deny Seba a fair trial.*

Finally, Seba argues the cumulative effect of multiple errors in his case acted to deny him a fair trial.

> "In a cumulative error analysis, an appellate court aggregates all errors and, even though those errors would individually be considered harmless, analyzes whether their cumulative effect on the outcome of the trial is such that collectively they cannot be determined to be harmless. See *State v. Colston*, 290 Kan. 952, 978-79, 235 P.3d 1234 (2010). In other words, was the defendant's right to a fair trial violated because the combined errors affected the outcome of the trial? In a cumulative error analysis, '[i]f any of the errors being aggregated are constitutional in nature, the cumulative error must be harmless beyond a reasonable doubt.' *United States v. Toles*, 297 F.3d 959, 972 (10th Cir. 2002).

"In making the assessment of whether the cumulative errors are harmless error, an appellate court examines the errors in the context of the record as a whole considering how the district court dealt with the errors as they arose (including the efficacy, or lack of efficacy, of any remedial efforts); the nature and number of errors committed and their interrelationship, if any; and the strength of the evidence. . . . 'No prejudicial error may be found upon this cumulative effect rule . . . if the evidence is overwhelming against the defendant.' *Colston*, 290 Kan. 952, Syl. ¶ 15." *State v. Tully*, 293 Kan. 176, 205-06, 262 P.3d 314 (2011).

Here, the State conceded error regarding the failure to instruct the jury it could consider voluntary intoxication as a defense to the lesser included offense of attempted voluntary manslaughter. In addition, we have assumed error in the failure to instruct on the lesser included offense instructions of reckless second-degree murder and reckless involuntary manslaughter and imperfect self-defense voluntary manslaughter.

Seba has not asserted that constitutional error arose as to any individual issue, although he contends that cumulatively the errors violated his right to a fair trial as guaranteed by the Fourteenth Amendment to the United States Constitution and under the Kansas Constitution Bill of Rights, § 10. But he does not suggest a standard for making this determination. See *State v. Ward*, 292 Kan. 541, 569, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012). ("degree of certainty by which the court must be persuaded that the error did not affect the outcome will vary"). The clearly erroneous standard applied to the conceded error and the assumed errors, each of which relates to an unobjected-to instructional error. We will not belabor the question of what level of certainty applies because Seba fails to convince us he is entitled to a new trial even if we apply the most rigorous standard of constitutional error.

None of the conceded or assumed errors relates to another in a way that would compound any possible jury confusion or other prejudice. Moreover, overwhelming

39

evidence supports Seba's convictions. Furthermore, if we were to apply the constitutional standard, our conclusion as to the harmless nature of each assumed or conceded error would not change. Regarding the lesser included offense based on recklessness, the State presented strong evidence of Seba's intent to kill and his premeditation and the evidence that he acted recklessly was weak and disputed by Seba's own statements. And one of the assumed errors was based on a defense theory the jury had the chance to consider—voluntary intoxication. Adding another opportunity for the jury to consider the defense of intoxication would not have changed the facts that negated its application. Finally, Seba's own subjective statements defeat his claim of imperfect self-defense. As our previous discussions reveal, one can conclude beyond a reasonable doubt that none of the claimed errors would have affected the trial's outcome.

The cumulative impact of the conceded and assumed instructional errors in this case does not require the reversal of Seba's convictions. We, therefore, affirm Seba's convictions and sentences.

Affirmed.