No. 98,196

STATE OF KANSAS, *Appellee,* v. MARK A. RIOJAS, *Appellant.*

(204 P.3d 578)

Opinion filed March 27, 2009.

*Shawn E. Minihan,* of Kansas Appellate Defender Office, argued the cause, and was on the brief for the appellant.

*Lesley A. Isherwood,* assistant district attorney, argued the cause, and *Nola Tedesco Foulston,* district attorney, and *Stephen N. Six,* attorney general, were with her on the brief for the appellee.

The opinion of the court was delivered by

ROSEN, J.: Mark A. Riojas appeals from his convictions and sentence for one count of felony murder, K.S.A. 21-3401 (b), and one count of aggravated robbery, K.S.A. 21-3427. Jurisdiction lies with this court under K.S.A. 22-3601(b)(1).

Richard Quinones was working as the third-shift manager at a Burger King in Wichita, Kansas, on the morning of March 11, 2006. Shortly before 1:40 a.m., he saw two men, one African-American and one Hispanic, running toward the Burger King from the parking lot of a McDonald's across the street. It appeared that the Hispanic man was chasing the African-American man. The Hispanic man then tackled the other man and took him to the ground. They struggled, and then the African-American man got up and began to run more slowly toward the Burger King. The Hispanic man pursued him and again forcefully took him to the ground.

Due to a wall that partially obstructed his vision, Quinones was unable to see what happened next. Another employee, Jose O'Campo, saw the man who was with the African-American man lean over and search through the fallen man's pockets, grab a wallet, and search through it. He saw blood on the fallen man's shirt, and told Quinones that someone needed help. After about a minute, Quinones and another employee, Uzziel Portugal, went out of the store to determine what was going on. The Hispanic man said that "nothing's going on, everything is good." The African-American man pulled himself off the ground slightly and said, "Help me;

I've been stabbed." O'Campo then called 911, and Quinones spoke with the dispatch operator.

Quinones and Portugal started to walk toward the pair of men and saw that the African-American man had blood on him. The Hispanic man then told them that the African-American man needed help and they should call 911. The Hispanic man kept his left hand concealed behind his back while talking to Quinones. He then left the scene when Quinones began talking to the other man. The victim told Quinones that he had been stabbed by "the person that just walked away" and said the attacker was Mexican and was named "Mike." Quinones later identified Riojas as the man whom he saw leaving the scene.

The victim then asked Portugal to call the victim's mother. Portugal called the number that the victim provided three times and reached an answering machine each time. When the police arrived, the victim had become incoherent. His pulse had failed by the time medical support arrived. He was pronounced dead at the hospital as a result of a stab wound to the chest.

Investigators determined that the victim was named Kenny Brown and that he had been staying at the Red Carpet Inn a few blocks away from the Burger King. Police interviewed people at the Red Carpet and identified a suspect who went by the name "Mexican Mike." Later that morning, the police encountered Riojas walking on a sidewalk. Because he matched the description of Brown's assailant, police told him he had been named as someone who might know who Mexican Mike was and asked to speak to him at police headquarters.

Riojas consented to an interview. He initially told police that he met Brown at the apartment of Anthony Dailey and Brenda Sullivan. Riojas was assisting in a drug transaction and accompanied Brown to the house of a man named Miguel. Riojas waited outside, and after a while he watched Brown run out of the house with Miguel in pursuit. Riojas ran after them, but was slowed down because his feet hurt. After removing his shoes, he continued to follow the two men. He observed Miguel chase Brown towards the McDonald's, onto a street, and then back toward the Burger King, where he fell on top of Brown. Riojas ran over to assist Brown,

and, when several men came out of the Burger King, Riojas asked them to call 911. Riojas stated that, while trying to help Brown, Brown asked him to call his mother and gave him his PIN for a financial services card. He asked Riojas to take his credit card from his wallet and use it to pay his drug debt to Miguel. Riojas attempted to make withdrawals at a QuikTrip and the hospital where Brown was pronounced dead.

Riojas then accompanied police to the area where Miguel's house was supposed to be, but he was unable to identify the house. They then drove to the apartment of Mike Nelson, where Riojas said he was living, but Riojas did not have a key to the apartment and Nelson was not home. They finally drove to the Red Carpet Inn to speak with Anthony Dailey and Brenda Sullivan. Dailey looked at Riojas and said he knew him but could not remember his name. Brenda Sullivan then came outside and identified Riojas as either "Mexican Mike" or "Mexican Mark." That afternoon investigators returned to Nelson's apartment, where they located a forklift safety card belonging to the victim.

On March 16, 2007, the State filed a complaint/information charging Riojas with one count of first-degree felony murder, K.S.A. 21-3401, and one count of aggravated robbery, K.S.A. 21-3427. Following a jury trial, Riojas was found guilty of both counts. The trial court sentenced Riojas to a term of life imprisonment for felony murder and a consecutive term of 233 months for aggravated robbery. He timely appeals.

Riojas first argues that the trial court erroneously admitted evidence of a prior bad act contrary to K.S.A. 60-455. Brenda Sullivan testified that Riojas visited her and her husband's hotel room and, in the course of playing with a knife, stated that he had cut people in the past. He contends on appeal that her testimony constituted impermissible evidence of prior bad conduct and propensity to attack people with knives.

When considering a challenge to the admission of evidence, the first step is to determine whether the evidence is relevant. *State v. Carapezza*, 286 Kan. 992, 997, 191 P.3d 256 (2008). All relevant evidence is admissible unless prohibited by statute. K.S.A. 60-407(f). Relevant evidence is any "evidence having any tendency in

reason to prove any material fact." K.S.A. 60-401(b). Relevance is established by a material or logical connection between the asserted facts and the inference or result that they are intended to establish. *Carapezza, 286 Kan. at 997.*

After relevance is established, the second step requires the court to apply the statutory rules governing the admission and exclusion of evidence. These rules are applied either as a matter of law or in the exercise of the trial court's discretion, depending on the rule in question. The standard of review of the probative element of K.S.A. 60-455 evidence is abuse of discretion. *Carapezza,* 286 Kan. at 998.

Analysis under K.S.A. 60-455 requires several steps. The court must determine that the evidence is relevant to prove a material fact. The court must also determine that the material fact is in dispute. The court must further determine that the probative value of the evidence outweighs the potential for producing undue prejudice. Finally, the court must give a limiting instruction informing the jury of the specific purpose for admitting whatever 60-455 evidence comes in. *Carapezza,* 286 Kan. at 998 (quoting *State v. Reid,* 286 Kan. 494, Syl. ¶ 5, 186 P.3d 713 [2008]).

Anthony Dailey testified on direct examination that Riojas had visited his hotel room earlier in the day of the murder:

"[Dailey] A. . . . [H]e brung some juice and some eggs and stuff. And I guess a little while after he left, I discovered I had a knife missing. And that's when I called Keith Dorsey and told him if he see Mike, to get my knife from him.

. . . .

"A. Uh, I believe it had a red handle on it. And one part was a knife and one part was like a razor. Two blades. Like one razor and one knife.

"Q. You called your buddy so he could tell Mexican Mike to bring it back to you.

"A. Right. Right.

"Q. Why did you think he is the one that took it?

"A. 'Cause I had noticed it. And then, after he had left, I noticed it missing."

On cross-examination, it was pointed out that a number of people had been in the hotel room smoking drugs. Dailey testified that he did not see Riojas take the knife and that other people had been in and out of the room.

Early during the direct examination of Brenda Sullivan, the following exchange took place:

"Q. Could you tell the jury about your knife that was in the room and how — what it had to do with Mexican Mike.

"A. Well, it started off when — he was playing with it. We was waiting on my husband to get back, and he was playing with it, clicking it open, *telling me how, uh, how he used to cut people from something to the sternum.* And he was a little bit vivid, so I took it from him, 'cause it was, you know, getting a little out of control. So I took it and I put it on my table. The knife is a red knife. About — I'd say about that long. It got a blade on one end and a razor on the other end." (Emphasis added.)

She then testified that she was alone in the hotel room with Riojas when the conversation about the knife took place. She proceeded to testify that Riojas later went down the hall to another room and then returned:

"A. . . . . I tell him he can't come in there like that, you know. And he was all excited. He wanted something — he wanted a weapon or something. And I was like, No, you can't have, you know — Anthony told him — I think Anthony was the one that told him, No, we don't have no weapons. And then, when he left, then I noticed that — we noticed that the knife was gone.

. . . .

"A. 'Cause he came in to get his paper — he had like a folder and some other stuff in there when he had — when he left, so he came in to get that. And then, later on, I missed my knife."

Riojas contends on appeal that Sullivan's statement "how he used to cut people from something to the sternum" violated K.S.A. 60-455.

K.S.A. 60-455 provides:

"Subject to K.S.A. 60-447 evidence that a person committed a crime or civil wrong on a specified occasion, is inadmissible to prove his or her disposition to commit crime or civil wrong as the basis for an inference that the person committed another crime or civil wrong on another specified occasion but, subject to K.S.A. 60-445 and 60-448 such evidence is admissible when relevant to prove some other material fact including motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident."

Before trial, Riojas' counsel filed a motion in limine seeking to bar the State from introducing evidence implying that he had a reputation for criminal activity. The motion specified references to

Riojas being on parole and suggestions that he was a suspect in or had committed any uncharged crime, particularly, the theft of some DVD's. At the hearing on the motion, counsel for Riojas specified that he wanted the court to exclude Brenda Sullivan's testimony that "my client made a statement that he was good with a knife and had hurt someone before." The trial court elected to allow the testimony because "the prejudice does not overcome the probative value of that statement."

Riojas did not object to any of Sullivan's trial testimony regarding the knife.

K.S.A. 60-404 requires a timely and specific objection to the admission of evidence at a trial in order to preserve issues arising from that admission for appeal. The statute states:

"A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless there appears of record objection to the evidence timely interposed and so stated as to make clear the specific ground of objection."

We require that a party must make a timely and specific objection in order to preserve an issue for appeal relating to the admissibility of evidence. K.S.A. 60-404; *Carapezza*, 286 Kan. at 1002; *State v. Francis*, 282 Kan. 120, 138, 145 P.3d 48 (2006) (defendant precluded from raising issue of admission of evidence under K.S.A. 60-455 because defendant failed to object at trial). This rule holds true even if the trial court already denied a motion to suppress evidence prior to trial. *State v. Stevens*, 285 Kan. 307, 326, 172 P.3d 570 (2007). The contemporaneous objection requirement is a "salutary procedural tool" that gives the trial court "the opportunity to conduct the trial without using tainted evidence, and thus avoid possible reversal and a new trial." *Baker v. State*, 204 Kan. 607, 611, 464 P.2d 212 (1970).

Appellate courts have recognized three exceptions to the rule that issues may not be raised for the first time on appeal: (1) where the newly asserted theory involves only a question of law arising on proved or admitted facts and is finally determinative of the case; (2) where consideration of the theory is necessary to serve the ends of justice or to prevent denial of fundamental rights; and (3) where

the judgment of the district court may be upheld on appeal even though that court may have relied on the wrong ground or assigned a wrong reason for its decision. *State v. Poulton*, 286 Kan. 1, 5, 179 P.3d 1145 (2008).

In the present case, we find that the exceptions do not apply. Further, Riojas' counsel not only failed to make a timely objection to Sullivan's statement; counsel also raised the issue with Riojas on redirect examination:

"Q. Did you ever tell Miss Sullivan that you had cut a person from sternum to — cut a person —

"A. No.

"Q. — from sternum to —

"A. No, ma'am. She had asked me what type of work I had done one time when we were alone, and she — that's one of the times where she made some advances, and I told her, Nah, I worked, you know, in IBP packing house, you know, slaughter.

"Q. Did you tell her you worked at a slaughterhouse?

"A. Yes, ma'am. That I worked on a kill floor one time, and it's — you know, yeah. But I told her that what we did was, every now and then, you would have a cow that had a fetus, and when you'd catch the fetus and then you would have to send the fetus on another line.

"Q. Never told her you did that to a person.

"A. No, ma'am. I never did."

Riojas did not object to her statement, and then, he proceeded to discuss her statement during his own testimony. A defendant may not use evidence to his or her own advantage and then complain of the action on appeal. The trial court did not err in admitting the statement.

Riojas next argues that the trial court erred in allowing photographs of the victim's body, bloody shirt, and medical treatment. The State offered photographic exhibits 4A, 4B, 4C, 13A, 13D, 13H, 14A, 14B, 14C, and 19, which showed the victim's head and torso, emergency responders performing chest compressions on the victim, the victim's lifeless body, the knife wound to the victim's chest, the victim's heart, the victim's bloody shirt, and the victim while still alive. The photographs were admitted over Riojas' objections.

The standard of review for the admission of photographic evidence requires the appellate court to first determine whether the photos are relevant. If a party argued that the photographs are overly repetitious, gruesome, or inflammatory, that is to say, prejudicial, the standard of review is abuse of discretion. *State v. Sappington*, 285 Kan. 176, 194, 169 P.3d 1107 (2007).

Photographs depicting the extent, nature, and number of wounds inflicted are generally relevant in murder cases. *State v. Adams*, 280 Kan. 494, 510, 124 P.3d 19 (2005). Although they may sometimes be gruesome, photographs that aid a pathologist in explaining the cause of death are relevant and admissible. *State v. Cavaness*, 278 Kan. 469, 477, 101 P.3d 717 (2004); *State v. Deal*, 271 Kan. 483, 493, 23 P.3d 840 (2001). The State has the burden of proving all the elements of the crime charged, and photographs used to prove the elements of the crime, including the fact and manner of death and the violent nature of the crime, are relevant and admissible even if the cause of death is not contested. *Sappington*, 285 Kan. at 195; *State v. Bell*, 273 Kan. 49, 53, 41 P.3d 783 (2002). Photographs used to identify the victim may likewise be relevant and admissible. *State v. Crum*, 286 Kan. 145, 159, 184 P.3d 222 (2008). This court has held, however, that admitting such photographs is error when they do not help explain or supplement the testimony but instead serve to "inflame the minds of the members of the jury." *State v. Boyd*, 216 Kan. 373, 377, 532 P.2d 1064 (1975).

The pictures are not extraordinarily gruesome. The wound is visible as a slit; the photographs do not show blood on the victim's body, and the pictures were introduced for legitimate purposes of identification, evidence of the cause of death, and explanation of the coroner's testimony. The photographs of the bloody shirt were taken from different angles and showed the estimated entry and exit points of the wounds suffered by the victim.

In all, the trial court did not abuse its discretion in weighing the probative value of the 10 photographs and their potential for undue prejudice. The photographs do not appear to distort the factual premises for which they were offered, and they do not appear to have been introduced for the primary purpose of inflaming the

passion of the jurors. Finally, they do not appear unduly repetitious or cumulative; they depict the victim and his clothing from different angles and in different aspects.

For his final two claims, Riojas raises issues that arise from his sentencing. First, he claims the trial court erred in sentencing him based on a criminal history that was not proved to a jury beyond a reasonable doubt. Riojas was assigned a criminal history score of A based on 3 adult person felonies, 2 adult nonperson felonies, and 13 nonperson misdemeanors. He cites *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000), as necessitating submitting the factual basis for his criminal history to the jury. Without such a jury determination, he contends his criminal history score should not have been raised from I to A.

Interpretation of a sentencing statute is a question of law, and the appellate court's standard of review is unlimited. *State v. Ruiz-Reyes*, 285 Kan. 650, 653, 175 P.3d 849 (2008). The constitutionality of a sentencing statute is a question of law over which this court has unlimited review. *State v. Allen*, 283 Kan. 372, 374, 153 P.3d 488 (2007).

This court has repeatedly addressed this issue, consistently reaching the same result. The issue was initially addressed in *State v. Ivory*, 273 Kan. 44, 41 P.3d 781(2002), and was decided adversely to the appellant. The holding in *Ivory* has remained good law in the post-*Apprendi* era. See *James v. United States*, 550 U.S. 192, 167 L. Ed. 2d 532, 127 S. Ct. 1586 (2007); *State v. Storey*, 286 Kan. 7, Syl. ¶ 4, 179 P.3d 1137 (2008); *State v. Farmer*, 285 Kan. 541, 555, 175 P.3d 221 (2008); *State v. Holt*, 285 Kan. 760, 777, 175 P.3d 239 (2008); *State v. Gaither*, 283 Kan. 671, 693, 156 P.3d 602 (2007).

Riojas offers us no compelling reason to revisit our current holding on the constitutionality of calculating criminal history scores without submitting them to a jury, and the trial court did not err in applying a criminal history of A in this case.

The second sentencing error raised by Riojas is that the trial court erred in assessing a Board of Indigents' Defense Services application fee. At sentencing, the trial court imposed a $100 application fee against Riojas under K.S.A. 22-4529.

Interpretation of a sentencing statute is a question of law, and the appellate court's standard of review is unlimited. *State v. Ruiz-Reyes*, 285 Kan. at 653.

Riojas contends that the imposition of the application fee without considering ability to pay or the burden that it would impose violates *State v. Robinson*, 281 Kan. 538, 132 P.3d 934 (2006). In *State v. Hawkins*, 285 Kan. 842, 176 P.3d 174 (2008), this court distinguished the K.S.A. 22-4529 application fee from the K.S.A. 22-4513 attorney fees reimbursement that *Robinson* addressed. The time for ordering the payment of the application fee is at the time the defendant applies for appointed counsel, rather than at the time of sentencing. Then, if the ordered fees remain unpaid at sentencing, the court may include the unpaid fee in its sentencing order without making any additional findings. 285 Kan. 842, Syl. ¶¶ 5, 7.

Here, the application fee remained unpaid at sentencing. The fact that the trial court made no additional findings at the time of sentencing was not error and does not require reversal.

Affirmed.