IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 112,611

STATE OF KANSAS,
*Appellee*,

v.

TROY LAMONT LOVE, II,
*Appellant*.

SYLLABUS BY THE COURT

1.

The standard of review for admission of photographic evidence requires an appellate court to first determine whether the photographs were relevant. If a party argues the photographs were overly repetitious, gruesome, or inflammatory, *i.e.*, prejudicial, the standard of review is abuse of discretion.

2.

An appellate court reviews whether evidence is cumulative for an abuse of discretion.

3.

Judicial discretion is abused if judicial action is: (a) arbitrary, fanciful, or unreasonable, *i.e.*, if no reasonable person would have taken the view adopted by the trial court; (b) based on an error of law, *i.e.*, if the discretion is guided by an erroneous legal conclusion; or (c) based on an erroneous fact, *i.e.*, if substantial competent evidence does not support a factual finding on which a prerequisite conclusion of law or the exercise of

1

discretion is based. The burden of showing abuse of discretion rests with the party asserting the error.

4.

It is not an abuse of discretion to admit autopsy photographs showing multiple views of internal physical injuries and assist in explaining medical conclusions on the nature of the trauma suffered by a victim and the cause of death, even if the photographs are gruesome and medical testimony has already described the injuries to the jury.

5.

A defendant is entitled to present the defendant's theory of defense and the exclusion of evidence integral to that theory violates the defendant's fundamental right to a fair trial. But the right to present a defense is subject to statutory rules and caselaw interpreting rules of evidence and procedure. A trial court does not err by excluding evidence that is irrelevant to a legally sufficient theory of defense.

6.

Failure to make a sufficient proffer of excluded evidence precludes appellate review because there is no basis to consider whether the trial court abused its discretion regarding the evidence in controversy.

7.

Expert testimony is generally required in medical malpractice cases to establish the applicable standard of care and to prove causation, except when lack of reasonable care or existence of proximate cause is apparent to an average layperson from common knowledge or experience.

8.

To determine whether prosecutorial error occurred, an appellate court must first decide whether the prosecutorial act complained of falls outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial. If that error is found, the appellate court must next determine whether the error prejudiced the defendant's due process rights to a fair trial.

9.

When evaluating the prejudice prong for reversible prosecutorial error, an appellate court uses the constitutional harmlessness inquiry from *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967). With that inquiry, prosecutorial error is harmless if the State proves beyond a reasonable doubt the error complained of will not or did not affect the trial's outcome in light of the entire record, *i.e.*, when there is no reasonable possibility the error contributed to the verdict.

10.

To preserve the issue for appellate review, a contemporaneous objection must be made to all evidentiary claims of error, including those alleging prosecutorial error.

11.

There is no federal constitutional requirement that a jury be instructed on lesser included offenses not recognized as such by state law.

12.

Section 5 of the Kansas Constitution Bill of Rights, which declares, "The right of trial by jury shall be inviolate," applies no further than to give the right of such trial upon issues of fact so tried at common law.

13.

A defendant has a right under Section 5 of the Kansas Constitution Bill of Rights to have a jury determine his guilt of the charged crime in a felony prosecution. But determining what further crimes upon which the jury should be instructed as lesser included offenses is a matter of law for the court.

Appeal from Saline District Court; PATRICK H. THOMPSON, judge. Opinion filed January 20, 2017. Affirmed.

*Peter Maharry*, of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant.

*Ellen H. Mitchell*, county attorney, argued the cause, and *Christina Trocheck*, assistant county attorney, and *Derek Schmidt*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

BILES, J.: Troy L. Love II argues his felony murder and child abuse convictions must be reversed, alleging: (1) The district court erred by admitting 14 autopsy photographs that he alleges were cumulative and unduly prejudicial; (2) the district court erred by excluding evidence about a medical malpractice lawsuit the child's mother filed against a doctor who treated the victim prior to her death; (3) the prosecutor erred by improperly bolstering the mother's credibility as a witness during opening remarks and in the examination of other witnesses; (4) the district court erred by failing to instruct the jury on unintentional second-degree murder as a lesser included offense of felony murder; and finally, (5) if the court decides none of these claimed errors requires reversal standing alone, their cumulative effect deprived him of a fair trial. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

The facts are tragic and disturbing. Love frequently cared for Robin Harrington's three children, including 18-month-old Bre'Elle. On April 1, 2012, Harrington noticed Bre'Elle's bloodshot eyes and bruising inside the left ear. Later that week, Bre'Elle could not turn her neck and had begun losing hair. On April 7, Harrington took the child to the emergency room where a physician, Venkata Katasani, diagnosed Bre'Elle with an ear infection and a swollen lymph node.

On April 9, Harrington put Bre'Elle down for a nap and then went to sleep herself until Love woke her up. He was holding Bre'Elle's limp body and said she was not breathing. Harrington began CPR and sent Love to alert a neighbor. Someone called 911. Love left the scene.

When emergency personnel arrived, Bre'Elle did not have a pulse and was not breathing. She was suffering from extraordinarily high intracranial pressure, hemorrhaging in the lining surrounding her brain, swelling and herniation of the brain, as well as a "gaping" fracture of the 7th cervical vertebra. She also suffered from recent hemorrhaging in her retinae and optic nerves and the lining surrounding her spinal cord. Doctors determined she was brain dead and life support was withdrawn. The cause of death was injury to the brain and spinal cord from multiple blunt force traumas.

Following a police investigation, a warrant was issued for Love's arrest on April 18. He turned himself in. The State charged Love with felony murder and two counts of child abuse: One count alleged abuse occurring between March 24 and April 8 and the other alleged abuse on April 9.

At trial, Love testified that sometime after Harrington put Bre'Elle down for a nap, he heard noises in the children's bedroom. He went to check and the children were jumping on the bed. Love said he went to get Bre'Elle a drink, and when he returned she was lying unresponsive on the floor.

A jury convicted Love of felony murder and child abuse for his acts on April 9. It acquitted him of the child abuse alleged between March 24 and April 8. Love was sentenced to life with a minimum of 20 years for the felony-murder conviction and a presumptive sentence of 55 months for the child abuse conviction was imposed and ordered to be run consecutive to the sentence for the felony-murder conviction. This is Love's direct appeal.

Jurisdiction is proper. See K.S.A. 2015 Supp. 22-3601(b)(3)-(4) (life sentence imposed; defendant convicted of off-grid crime).

AUTOPSY PHOTOGRAPHS

Love argues the district court erred by admitting autopsy photographs, claiming their probative value was outweighed by their potential for undue prejudice because they were cumulative of the medical testimony, gruesome, and served only an inflammatory purpose.

*Additional Facts*

As part of its medical evidence, the State presented testimony from Dr. Scott Kipper, a deputy medical examiner. Kipper testified the vertebral fracture would have caused instant paraplegia and that the fatal injuries were consistent with violent shaking. He also testified the child had multiple older, nonfatal injuries, noting healing

6

compression and fractures of several vertebrae. Kipper could not date these injuries but believed they were at least two or three weeks old because there was no swelling. He testified Bre'Elle had fractures on her left and right first ribs that were a week to 10 days old and healing fractures on her left fifth and sixth ribs along the back part of the chest, near where the ribs met the spine. Kipper said these fractures were also consistent with shaking. He further noted Bre'Elle had bruising on the front and back of her left ear, bruising on the right side of her neck, and bleeding deep within the soft tissue of her buttocks. He said this deep-tissue bleeding was at least two to four days old.

After Kipper described the injuries and cause of death, the State began to question him about 14 autopsy photographs. Love's counsel objected but did not specify the basis for that objection. Counsel said that "[i]n light of the testimony," he was "not sure of the purpose of showing the autopsy photos at this point." This statement suggests counsel was arguing the photographs were cumulative. The district court overruled the objection.

Using the photographs, Kipper then pointed out Bre'Elle's injuries to the jury. Some photographs covered similar ground. For instance, two showed a monitor wire sutured to the scalp from different angles. Three showed the inside of the rib cage after it had been removed from the body; two of these depicted the area after it had been exposed to a chemical that changed the tissue coloration. The only difference between the latter two was the placement of arrows in one pointing to the healing around the earlier rib injuries. Two photographs showed a cross-section of the vertebral column from different distances that revealed the fractures and compression deformities in the vertebrae and spinal cord compression. Three photographs showed the hemorrhaging in the retina and optic nerves.

*Standard of Review*

> """The standard of review for the admission of photographic evidence requires the appellate court to first determine whether the photos are relevant. If a party argued that the photographs are overly repetitious, gruesome, or inflammatory, that is to say, prejudicial, the standard of review is abuse of discretion."' *State v. Rodriguez,* 295 Kan. 1146, 1156, 289 P.3d 85 (2012) (quoting *State v. Riojas,* 288 Kan. 379, 387, 204 P.3d 578 [2009]). Abuse of discretion also is the standard of review when a party challenges evidence as cumulative." *State v. Hilt*, 299 Kan. 176, 195, 322 P.3d 367 (2014).

The burden of demonstrating abuse of discretion falls on the party asserting the error. See *State v. Rodriguez*, 295 Kan. 1146, 1156, 289 P.3d 85 (2012). A district court abuses its discretion when the challenged action

> """(1) is arbitrary, fanciful, or unreasonable, *i.e.*, if no reasonable person would have taken the view adopted by the trial court; (2) is based on an error of law, *i.e.*, if the discretion is guided by an erroneous legal conclusion; or (3) is based on an error of fact, *i.e.*, if substantial competent evidence does not support a factual finding on which a prerequisite conclusion of law or the exercise of discretion is based.""" 295 Kan. at 1156 (quoting *State v. Robinson*, 293 Kan. 1002, 1027-28, 270 P.3d 1183 [2012]).

*Discussion*

Photographic evidence is relevant and generally admissible if it has a reasonable tendency to prove a material fact. Autopsy photographs assisting a pathologist in explaining the cause of death are relevant and admissible, but those serving only to """inflame the minds of the members of the jury""" are not. *Rodriguez*, 295 Kan. at 1157 (quoting *State v. Riojas*, 288 Kan. 379, 387, 204 P.3d 578 [2009]). In addition, a district court may abuse its discretion by admitting unduly repetitious photographs. 295 Kan. at 1157. "The admission of photographs in a murder case has rarely been held to be an abuse of discretion." 295 Kan. at 1157 (citing *State v. Sappington*, 285 Kan. 176, 195,

8

169 P.3d 1107 [2007]). "'[B]ecause the State has the burden to prove every element of the crime charged, photographs used to prove the elements of the crime, including the fact and manner of death and the violent nature of the crime, are relevant even if the cause of death is not contested.'" *Hilt*, 299 Kan. at 196; see *State v. Dupree*, 304 Kan. 43, 64, 371 P.3d 862 (2016) ("As to materiality, photographs showing the jury the manner of death are material in a murder trial.").

Love's arguments mirror those raised and rejected in *Rodriguez*. See 295 Kan. at 1157-58 (undeniably gruesome autopsy photographs of the child victim were not cumulative to each other in addition to medical examiner's testimony in describing cause of victim's death, depicted victim's internal injuries in a way that medical examiner's mere words could not, and were not repetitious of each other as each was taken from a different angle). Although the autopsy photographs are graphic, they assisted Kipper in explaining his findings on cause of the victim's death and her extensive earlier injuries, for which the State had charged Love with a separate count of child abuse. In addition, the photographs are not cumulative of each other because they show injuries from different angles (or, in the case of the rib cage photographs in different ways). And, like the photographs in *Rodriguez*, the photographs demonstrate the injuries in a way Kipper's testimony alone could not.

We hold the district court did not abuse its discretion admitting these 14 photographs.

THE MEDICAL MALPRACTICE LAWSUIT

Love next argues the district court erred by excluding evidence about Harrington's medical malpractice suit against the hospital and medical personnel involved in Bre'Elle's April 7 emergency room visit when she was diagnosed with an ear infection and a

9

swollen lymph node. Love claims the lawsuit was relevant to the cause of death and witness credibility. He casts this as a constitutional question, framing the district court's ruling as a denial of his right to present a defense.

*Additional Facts*

Early in the trial, both the State and defense counsel learned Harrington had filed a medical malpractice suit against Salina Regional Hospital and Katasani arising from the April 7 emergency room treatment Bre'Elle received. The State moved to exclude this evidence as irrelevant. Defense counsel argued the civil case would not have been filed without an expert opinion supporting the underlying allegation that medical malpractice caused the child's death. The district court granted the State's motion, ruling that the fact of the lawsuit's existence was irrelevant to the criminal proceedings.

But the court noted Love could still have a medical expert as part of his defense and could ask Katasani about the care provided. Defense counsel proffered the petition filed in the civil case. In it, Harrington alleges hospital personnel and Katasani failed to meet the acceptable standard of care, causing or contributing to the child's death. It claims the medical defendants spent inadequate time with Harrington or Bre'Elle and failed to order tests or radiological studies of her neck.

In a motion for new trial, Love again argued the jury should have been allowed to consider that there was an allegation "that's been affirmed" that something other than Love contributed to Bre'Elle's death. The district court denied the motion, ruling that the information was not relevant because the felony-murder charge and the underlying child abuse, which were the only crimes of conviction, arose from incidents taking place on April 9.

*Standard of Review*

Love advances this issue as a constitutional challenge concerning his right to present a defense. But this right is subject to the rules of evidence. See *State v. Evans*, 275 Kan. 95, 102, 62 P.3d 220 (2003). And "it is not error for the trial court to exclude evidence that is not relevant to a legally sufficient theory of defense." *State v. Roeder*, 300 Kan. 901, 914, 336 P.3d 831 (2014), *cert. denied* 135 S. Ct. 2316 (2015).

"[A]ll relevant evidence is admissible" except as otherwise provided by statute. K.S.A. 60-407(f). "The test for relevancy is whether the evidence has 'any tendency in reason to prove any material fact.'" *Dupree*, 304 Kan. at 63. Evidence is relevant when it is both material and probative. Material evidence is that which supports a fact in dispute or in issue in the case. 304 Kan. at 63; *State v. Coones*, 301 Kan. 64, 78, 339 P.3d 375 (2014). "Materiality is reviewed de novo." *Coones*, 301 Kan. at 78. Probative evidence is that which has any tendency to prove a material fact. Probativity is reviewed for an abuse of discretion. *Dupree*, 304 Kan. at 64.

*Discussion*

Love argues the civil lawsuit was relevant to cause of death. The State's response is that "even the defendant's own expert was of the opinion that the fatal injuries . . . were inflicted on April 9 . . . and the previous injuries did not contribute to her death." The State does not explain why this would preclude Love from presenting other relevant evidence about cause of death.

At the outset, we must acknowledge shortcomings in Love's proffer at trial. It lacks information about how Love would have used the malpractice litigation in the criminal trial or how the alleged negligence by health care providers was causally related

11

to Bre'Elle's April 9 death. For example, Love did not identify a witness who would testify about the civil lawsuit or include in the proffer what that witness would say.

K.S.A. 60-405 provides:

"A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous exclusion of evidence unless it appears of record that the proponent of the evidence either made known the substance of the evidence in a form and a method approved by the judge, or indicated the substance of the expected evidence by questions indicating the desired answers."

In *State v. Hudgins*, 301 Kan. 629, 346 P.3d 1062 (2015), this court considered an insufficient proffer. Defendant was convicted of felony murder after killing two people in a collision during a high-speed police chase. At trial, he sought to introduce evidence that the pursuing deputy did not do so in accordance with department policies. But defendant did not proffer the policy, the deputy's testimony in an earlier civil trial, or the deputy's personnel file. The *Hudgins* court held the record was inadequate for appellate review because it could not tell what, if any, departmental policy might be in dispute or how that policy may have been violated. As a result, there was insufficient information to determine whether the unspecified violation might have been relevant. *Hudgins*, 301 Kan. at 650-51.

In so ruling, the *Hudgins* court noted the party being limited by the exclusion of evidence must proffer to the trial court sufficient evidence to preserve the issue on appeal. The failure to meet that responsibility precludes appellate review because there is no basis to consider whether the trial court abused its discretion. 301 Kan. at 651. Love's proffer presents a similar problem.

12

The malpractice petition is the only item submitted in the record on this issue. And while that petition asserts a lack of proper medical care, it conveys no information as to how that may have caused or contributed to the child's death. Love made no proffer regarding how he intended to use the civil suit's existence at trial. And we are unable to speculate about the potential areas of inquiry or proof based on the limited proffer made at trial. This is especially problematic because the district court told Love he could still get an expert—specifically, the expert or experts Harrington or her attorneys might have consulted for the civil suit—as part of his defense to discuss causation, and could ask Katasani about the care he provided. Given the limited proffer we have no way to sort out what Love was unable to present to the jury—other than the allegations set forth in the petition.

Confining our relevancy analysis to the contention that the defendants caused or contributed to Bre'Elle's death, we can agree that the facts concerning whether Love killed the child would have been material in the criminal case. See K.S.A. 2015 Supp. 21-5402(a)(2) (defining felony murder as killing of human being while committing, attempting, or fleeing from inherently dangerous felony). But the fact of the civil lawsuit is simply equivalent to Harrington's opinion, alleging the defendants' negligence was a cause of her child's death. As a lay person, Harrington's testimony would be limited to opinions rationally based on her own perception and helpful to a clearer understanding of her own testimony. See K.S.A. 60-456(a) (listing types of layperson's testimonies admissible as a form of opinion or inferences).

Harrington would not be competent "to provide reliable testimony about medical matters beyond the common knowledge of lay persons, or those that are not readily apparent such as medical diagnosis or the effects of possible medical conditions." *State v. McFadden*, 34 Kan. App. 2d 473, 478, 122 P.3d 384 (2005) (citing *Smith v. Prudential Ins. Co.*, 136 Kan. 120, 124, 12 P.2d 793 [1932]). *Cf.* K.S.A. 60-456(b) (limiting expert

13

testimony to opinions based on facts or data perceived or known by the witness and within the scope of the witness' special knowledge, skill, experience, or training); *Puckett v. Mt. Carmel Regional Med. Center*, 290 Kan. 406, 435-36, 228 P.3d 1048 (2010) (expert testimony generally required to prove causation in medical malpractice cases except when apparent to average layperson from common knowledge or experience).

And to the extent Love suggests Harrington's testimony could be founded on the opinion of some unnamed medical expert who may have consulted in preparing the civil petition, there are at least two problems:  (1) Such testimony would not be rationally based on her own perceptions, so it would still be inadmissible as lay opinion testimony under K.S.A. 60-456(a); and (2) Love made an insufficient proffer to explain the facts needed to support such statements that fails to preserve the question for appeal. See *Hudgins*, 301 Kan. at 651 (explaining insufficient proffer for appellate review). We hold the district court did not abuse its discretion in concluding that the fact of the lawsuit lacked any tendency in reason to establish cause of death.

As to Love's additional argument that the malpractice lawsuit was relevant to the possible bias and credibility of Harrington and Katasani, the State correctly argues Love failed to preserve this as a basis for admitting the evidence by failing to assert it at trial—a point for which Love does not provide a response. See *State v. Swint*, 302 Kan. 326, 335-36, 352 P.3d 1014 (2015) (upholding the Court of Appeals' decision not to consider defendant's new theory raised for the first time on appeal to challenge district court ruling and stating "[t]he preservation problem means we do not reach the merits of the claim"); *State v. Tague*, 296 Kan. 993, 998-1000, 298 P.3d 273 (2013) (same); Supreme Court Rule 6.02(a)(5) (2015 Kan. Ct. R. Annot. 41).

Love next argues the prosecutor improperly vouched for Harrington's credibility by "repeatedly ask[ing] questions of witnesses and mak[ing] comments that Harrington was acting 'appropriately' and being 'cooperative.'"

*Additional Facts*

This issue falls into two categories. The first concerns the prosecutor's statements in opening arguments:

>  "Dr. O'Donnell, the emergency room physician who cared for Bre'Elle on that date, as well as the hospital chaplain, Harry Tysen, will both tell you that Robin [Harrington] was *appropriately distraught* and kept asking them what was happening with her child. *Robin was cooperative in providing them with information*. Dr. O'Donnell wanted to talk to the defendant to find out what had happened as he was the last one with Bre'Elle, but no one could get a hold of the defendant and didn't know where he was." (Emphasis added.)

The prosecutor later commented:  "Dr. Melhorn spoke with Ms. Harrington, and she'll tell you that Robin Harrington *was cooperative in providing information concerning Bre'Elle's care*." (Emphasis added.) The testimony was consistent with these opening remarks.

The second category concerns testimonial exchanges between the prosecutor and various witnesses, including Katasani and O'Donnell, an emergency room physician. Notably, Love did not object during any of them. The most representative exchange is the one with O'Donnell:

"Q. When you spoke with mother, was she appropriate during your contact with her?

"A. I believe she was and I was kind of looking for that, too."

"Q. Is that something you look for?

"A. Absolutely.

"Q. What were your observations of the mother?

"A. "Seemed appropriately distraught. Seemed concerned.

. . . .

"Q. When you asked mom questions, did she ever appear to you to be evasive in answering those questions?

"A. No."

*Standard of Review*

This court recently revisited our standard and nomenclature in the area previously referred to as "prosecutorial misconduct," which we have now termed as "prosecutorial error" as a way to more correctly frame the issue. See *State v. Sherman*, 305 Kan. 88, 107, 378 P.3d 1060 (2016).

In *Sherman* we recited the standard of review as a two-step process in which an appellate court must first decide whether a prosecutorial act complained of falls outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial. 305 Kan. at 109. If that error is found, "the appellate court must next determine whether [it] prejudiced the defendant's due process rights to a fair trial." 305 Kan. at 109. And to do that, the court uses the constitutional harmlessness inquiry from *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967). 305 Kan. at 109. Prosecutorial error is harmless if the State proves beyond a reasonable doubt the error will not or did not affect the trial's outcome in light of the entire record, *i.e.*, when there is no reasonable possibility the error contributed to the verdict. *Sherman*, 305 Kan. at 109.

16

*Discussion*

The "opening statement has a narrow purpose and scope. It is not evidence; and it is given only to assist the jury in understanding what each side expects its evidence to establish and to advise the jury what questions will be presented for its decision." *State v. Alger*, 282 Kan. 297, 305, 145 P.3d 12 (2006). Generally speaking, counsel may outline in opening statement what is expected to be proved "unless it is manifest that such proof would be incompetent, or the statement is made for the purpose of creating prejudice." *Miller v. Braun*, 196 Kan. 313, 317, 411 P.2d 621 (1966).

In reviewing the record, the prosecutor's comments were not phrased to express a personal opinion on Harrington's "appropriateness" or "cooperativeness." Similarly, the comments concerning the other witnesses simply outlined their expected testimonies. Nevertheless, *Miller* suggests this might still constitute an error if "it is manifest" that the testimony being described would be improper vouching as to Harrington's credibility or if the prosecutor made the comments for the purpose of prejudicing Love. See, *e.g.*, *State v. Manning*, 270 Kan. 674, 698, 19 P.3d 84 (2001) (questions compelling defendant or witness to comment on the credibility of another witness are improper because it is within the jury's province to weigh credibility).

On its face, the expected testimony went to Harrington's demeanor during her interactions with the witnesses from whom the testimony would be elicited. Love suggests such questions were "code" for whether Harrington was being truthful, but this is certainly not obvious from the record.

We hold no improper witness commentary on Harrington's credibility was manifest in the expected testimony the prosecutor described during the opening

17

statement. Therefore, Love has failed to establish prosecutorial error in the opening statement.

Turning next to the actual question-and-answer exchanges Love claims constitute prosecutorial error, there is a fundamental defect in his argument—he failed to object to any of the testimony he now argues was improper. See *State v. Bennington*, 293 Kan. 503, 529, 264 P.3d 440 (2011) ("'[C]ontemporaneous objection must be made to all evidentiary claims—including those alleging prosecutorial misconduct . . . .'"); *State v. Shadden*, 290 Kan. 803, 835, 235 P.3d 436 (2010) (same); *State v. King*, 288 Kan. 333, 349, 204 P.3d 585 (2009) ("From today forward, in accordance with the plain language of K.S.A. 60-404, evidentiary claims—including questions posed by a prosecutor and responses to those questions during trial—must be preserved by way of a contemporaneous objection for those claims to be reviewed on appeal."). Accordingly, we decline to address this issue since it was not preserved.

LESSER INCLUDED OFFENSES FOR FELONY MURDER

Love next argues the district court should have instructed the jury on intentional second-degree murder as a lesser included offense of felony murder. Love did not request the instruction at trial. At the time of trial the instruction would have been prohibited because by statute there are no lesser degrees of felony murder. K.S.A. 2015 Supp. 21-5109(b)(1); K.S.A. 2015 Supp. 21-5402(d). Though this rule was not in effect when Love committed his crimes, the rule applies retroactively to matters pending when it was adopted—a class of cases to which this case belongs. K.S.A. 2015 Supp. 21-5402(e).

To avoid this statutory problem, Love argues the elimination of lesser included offenses of felony murder violates his due process rights, citing *Beck v. Alabama*, 447 U.S. 625, 638, 100 S. Ct. 2382, 65 L. Ed. 2d 392 (1980), and the right to a jury trial

guaranteed by Section 5 of the Kansas Constitution Bill of Rights. Love also challenges the retroactive application of statutory changes to K.S.A. 2012 Supp. 21-5109 and K.S.A. 2013 Supp. 21-5402 under the Ex Post Facto Clause of the United States Constitution. But he acknowledges the Ex Post Facto Clause challenge was rejected in *State v. Todd*, 299 Kan. 263, 278-79, 323 P.3d 829 (2014). To the extent Love argues *Todd* was wrongly decided, we have adhered to it since and do so again. See, *e.g.*, *State v. Dupree*, 304 Kan. 377, 400, 373 P.3d 811 (2016); *State v. De La Torre*, 300 Kan. 591, 602, 331 P.3d 815 (2014).

We address his remaining federal and state constitutional claims and ultimately conclude they are without merit. We therefore conclude an intentional second-degree murder instruction would not have been legally appropriate, so the trial court's failure to give the instruction *sua sponte* was not error.

*The Federal Constitutional Claim*

Love argues, "The elimination of all lesser included offenses for felony murder violates the due process clause." He primarily relies on *Beck*, in which the Court held that the death penalty could not be imposed when the jury was not permitted to consider a lesser included noncapital offense when the evidence would have supported such a verdict.

In *Beck*, the defendant was tried for the capital offense of "'[r]obbery or attempts thereof when the victim is intentionally killed by the defendant.'" 447 U.S. at 627. Under Alabama law at the time, felony murder was "thus a lesser included offense of the capital crime of robbery-intentional killing." 447 U.S. at 628. But Alabama statutorily prohibited a judge from instructing on lesser included offenses in capital murder cases, so the jury was presented with the "choice of either convicting a defendant of capital crime, in which

19

case it is required to impose the death penalty, or acquitting him, thus allowing him to escape all penalties for his alleged participation in the crime." 447 U.S. at 628-29.

The *Beck* Court began its analysis by noting that "[a]t common law the jury was permitted to find the defendant guilty of any lesser offense *necessarily included in the offense charged*." (Emphasis added.) 447 U.S. at 633. And while acknowledged that lesser offenses were developed to aid the "prosecution in cases in which the proof failed to establish some element of the crime charged," "it has long been recognized that it can also be beneficial to the defendant because it affords the jury a less drastic alternative than the choice between conviction of the offense charged and acquittal." 447 U.S. at 633. It also recognized: "Alabama's failure to afford capital defendants the protection provided by lesser included offense instructions is unique in American criminal law." 447 U.S. at 635.

Importantly, the Court stated that "there is a significant constitutional difference between the death penalty and lesser punishments," and then held the unavailability of lesser included crime instructions enhanced the risk of an unwarranted conviction, and that "Alabama was constitutionally prohibited from withdrawing that option from the jury in a capital case." 447 U.S. at 637-38. But the Court declined to decide whether due process required the giving of such an instruction in a noncapital case. 447 U.S. at 638 n.14.

*Beck* dealt with whether lesser included offense instructions were required in a capital case, and it did so under different circumstances than those presented by Love. In *Beck*, felony murder was a lesser included crime of the charged capital crime under Alabama law. But in Kansas, felony murder has no lesser included crimes under state law. K.S.A. 2015 Supp. 21-5109(b) defines a "lesser included crime" as a "lesser degree of the same crime," explicitly stating there are no lesser degrees of felony murder, and as

20

"a crime where all elements of the lesser crime are identical to some of the elements of the crime charged." K.S.A. 2015 Supp. 21-5109(b)(1)-(2).

The Court addressed a more analogous situation in *Hopkins v. Reeves*, 524 U.S. 88, 118 S. Ct. 1895, 141 L. Ed. 2d 76 (1988), in which the Court considered "whether *Beck* requires state trial courts to instruct juries on offenses that are not lesser included offenses of the charged crime under state law." 524 U.S. at 90. In that case, the state of Nebraska charged the defendant with two counts of felony murder, which was a death-penalty-eligible crime under state law. At trial, defendant requested jury instructions for second-degree murder and manslaughter, which he argued were lesser included crimes. But the trial court refused to give the instructions because the Nebraska Supreme Court had consistently held those crimes were not lesser included crimes of felony murder. Defendant was convicted on both counts, and a three-judge sentencing panel imposed the death penalty after considering the aggravating and mitigating circumstances. 524 U.S. at 92-93.

The Court of Appeals for the Eighth Circuit held the trial court committed constitutional error when it refused to give the requested lesser included offense instructions because, like the unconstitutional Alabama statute in *Beck*, the Nebraska statute "'*prohibited* instructions on noncapital murder charges in cases where conviction made the defendant death-eligible.'" 524 U.S. at 93. The Supreme Court disagreed. It held there is no constitutional requirement to instruct juries on offenses that are not lesser included crimes of the charged crime under state law. 524 U.S. at 90-91. The Court noted that "[i]n Nebraska, instructions on offenses that have been determined to be lesser included offenses of the charged crime are available to defendants when the evidence supports them, in capital and noncapital cases alike." 524 U.S. at 95. It explained *Beck* was distinguishable, stating:

21

"The Alabama statute prohibited instructions on offenses that state law clearly recognized as lesser included offenses of the charged crime, and it did so only in capital cases. Alabama thus erected an 'artificial barrier' that restricted its juries to a choice between conviction for a capital offense and acquittal. [Citation omitted.] Here, by contrast, the Nebraska trial court did not deny respondent instructions on any existing lesser included offense of felony murder; it merely declined to give instructions on crimes that are not lesser included offenses. In so doing, the trial court did not create an 'artificial barrier' for the jury; nor did it treat capital cases differently from noncapital cases. Instead, it simply followed the Nebraska Supreme Court's interpretation of the relevant offenses under state law." *Hopkins*, 524 U.S. at 96.

The Court further distinguished between the all-or-nothing choice put to the jury in *Beck* and that in *Hopkins*. Under the Alabama statutory scheme at issue in *Beck*, the jury was required to impose the death penalty if it found the defendant guilty. But under the Nebraska scheme at issue in *Hopkins*, the jury only determined guilt, while sentencing was handled by a three-judge panel. 524 U.S. at 98. The jury was no longer on the horns of the dilemma between sentencing defendant to death or setting him free. See 524 U.S. at 98. The Court also noted that instructing the jury on homicide offenses that were not lesser included crimes would have created a different kind of distortion at trial:

"Nebraska proceeded against respondent only on a theory of felony murder, a crime that under state law has no lesser included homicide offenses. The State therefore assumed the obligation of proving only that crime, as well as any lesser included offenses that existed under state law and were supported by the evidence; its entire case focused solely on that obligation. To allow respondent to be convicted of homicide offenses that are *not* lesser included offenses of felony murder, therefore, would be to allow his jury to find beyond a reasonable doubt elements that the State had not attempted to prove, and indeed that it had ignored during the course of trial. This can hardly be said to be a reliable result: 'Where no lesser included offense exists, a lesser included offense instruction detracts from, rather than enhances, the rationality of the process.' *Spaziano v. Florida*, [468 U.S. 447,] 455, 104 S. Ct. [3154, 82 L. Ed. 2d 340 (1984)]." 524 U.S. at 99.

22

The issue Love raises is not whether he was entitled to have his jury instructed on a lesser included offense recognized by state law. Instead, he argues an instruction should have been given "on some *other* offense—what could be called a 'lesser related offense'—when no lesser included offense exists." *Hopkins*, 524 U.S. at 97. As *Hopkins* makes clear, there is no federal constitutional requirement for such an instruction in the context of capital crimes, let alone for noncapital crimes. As the Supreme Court noted, such a scheme would be "not only unprecedented, but also unworkable." 524 U.S. at 97. "Almost all States . . . provide instructions only on those offenses that have been deemed to constitute lesser included offenses of the charged crime. [Citation omitted.] [The Court has] never suggested that the Constitution requires anything more." 524 U.S. at 96-97.

In this case, application of K.S.A. 2015 Supp. 21-5402(b)(1) does not violate due process. Unlike the statutory scheme in *Beck*, the Kansas lesser-included-offense statute does not create a "capital specific artificial barrier to the provision of instructions on offenses that actually are lesser included offenses under state law"—felony murder is not a capital offense. Moreover, we perceive no distinction between a critical aspect of *Hopkins* and this case. In *Hopkins*, Nebraska common law established that the additional offenses upon which the defendant sought jury instructions were not lesser included offenses of felony murder. Here, K.S.A. 2015 Supp. 21-5109(b)(1) accomplishes the same thing. As this court has long recognized, the legislative branch is vested with the exclusive authority to define crimes and prescribe punishments. See *State v. Beard*, 274 Kan. 181, 185, 49 P.3d 492 (2002); *State v. McDaniel & Owens*, 228 Kan. 172, 182, 612 P.2d 1231 (1980); *In re MacLean*, 147 Kan. 678, 681, 78 P.2d 855 (1938).

*The Kansas Constitutional Claim*

Love's claim under the Kansas Constitution is based on Section 5 of the Kansas Constitution Bill of Rights, which states: "The right of trial by jury shall be inviolate." We have frequently recognized this right is a basic and fundamental feature of American jurisprudence. *Miller v. Johnson*, 295 Kan. 636, 647, 289 P.3d 1098 (2012). "Section 5 preserves the jury trial right as it historically existed at common law when our state's constitution came into existence." 295 Kan. at 647.

Love seizes on this broad proposition, arguing: "Allowing juries, rather than the State or district court, to decide whether a defendant is guilty of the charged crime or a lesser-included offense was a common law right as it existed when the Kansas Constitution came into existence." He then quotes the history of lesser included offenses, as recited by this court in *State v. Berberich*, 248 Kan. 854, 811 P.2d 1192 (1991) (noting early Kansas statutes codified traditional common-law rule—*i.e.*, the "elements test"—on instructing jury on lesser included crimes), *abrogated on other grounds by State v. Hensley*, 298 Kan. 422, 313 P.3d 814 (2013). Finally, he concludes: "Failure to give a legally and factually supported lesser-included offense [instruction] violates the state constitutional right to have a jury decide guilt as to each and every element."

In essence, Love contends that because juries were instructed on lesser included offenses at common law, the practice was frozen for all time when Section 5 made the right to a jury trial inviolate. His argument suggests a defendant is entitled in any prosecution to the possibility that the jury will convict him of lesser included offenses, and that the legislature somehow narrowed the right to a jury trial when it statutorily declared felony murder is not subject to the general rules governing the giving of lesser included offense instructions in other prosecutions. But this is an overbroad interpretation of Section 5 and its protections. Whether the jury is instructed on lesser included offenses

is a question of law, so the legislature did not infringe on Love's Section 5 rights when it declared there are no lesser included offenses of felony murder.

Although our caselaw has never explicitly acknowledged it, there are two basic questions in any Section 5 analysis: In what types of cases is a party entitled to a jury trial as a matter of right? See, *e.g.*, *Hasty v. Pierpoint*, 146 Kan. 517, 72 P.2d 69 (1937) (distinguishing causes at law from causes in equity); see also *City of Fort Scott v. Arbuckle*, 165 Kan. 374, 388-89, 196 P.2d 217 (1948) (distinguishing prosecutions for violation of municipal ordinances and state statutes). And when such a right exists, what does the right protect? See, *e.g.*, *Miller*, 295 Kan. at 647-48 (analyzing jury's role in determining damages); *Kimball v. Connor*, 3 Kan. 414, 432 (1866) ("[Section 5] . . . does [not] contemplate that every issue, which, by the laws in force at the adoption of the constitution of the State, was triable by jury . . . should remain irrevocably triable by that tribunal.").

In answering the second question, this court has consistently noted that when the Section 5 jury trial right is implicated, "'[i]t applies no further than to give the right of such trial *upon issues of fact so tried at common law* and does not affect the pleading stage of the case.'" (Emphasis added.) *Hasty*, 146 Kan. at 519. The right to have the jury determine issues of fact is in contrast to the determination of issues of law, which has always been the province of the court. See, *e.g.*, General Laws of the Territory of Kansas, 1859, ch. 25, sec. 274 ("That issues of law must be tried by the court . . . . Issues of fact arising in an action, for the recovery of money, or specific, real or personal property, shall be tried by a jury."). Issues of fact for the jury to determine include liability and actual damages in civil cases and guilt in criminal cases. See *Miller*, 295 Kan. at 648 (damages are jury issue under Section 5, citing *Samsel v. Wheeler Transport Services., Inc.*, 246 Kan. 336, 358, 789 P.2d 541 [1990]); *Smith v. Printup*, 254 Kan. 315, 324, 866 P.2d 985 (1993) (punitive damages not independent cause of action; no Section 5

25

protection); *In re Rolfs*, 30 Kan. 758, 763, 1 P. 523 (1883) (summary trial on offense criminal in nature by police judge without right of trial by jury on appeal violated Section 5); but see, *e.g.*, *Arbuckle*, 165 Kan. at 389 (no Section 5 violation when defendant not afforded a trial by jury on her appeal from police court's determination she had violated a city ordinance prohibiting disturbing the peace).

Prosecutions for violations of state criminal statutes unquestionably implicate Section 5. A defendant is entitled to "have the truth of [the] charge determined by an impartial jury . . . ." *Rolfs*, 30 Kan. at 763. But generally speaking, determining whether to instruct a jury on a lesser included offense is a matter of law for the court to determine. See *State v. Cooper*, 303 Kan. 764, 769, 366 P.3d 232 (2016) (defining standard of review for failure to give lesser included instruction). Whether a particular crime is a lesser included offense of a charged crime is also a question of law. See *State v. Belcher*, 269 Kan. 2, 4, 4 P.3d 1137 (2000); see also K.S.A. 2015 Supp. 21-5109(b)(1)-(4) (defining lesser included offenses as lesser degree of the charged crime, a crime necessarily included in the charged crime, and attempt to commit the charged crime).

When reviewing lesser included offense instructions on appeal, the appellate court reviews de novo the legal and factual appropriateness of the instruction sought. See *State v. Seba*, 305 Kan. 185, 192, 380 P. 3d 209 (2016). In applying the statutory test for whether the instruction was factually appropriate, the appellate court does not resolve factual conflicts but rather views the evidence in the light most favorable to the State. 305 Kan. at 192. Whether to give lesser included instructions is squarely in the court's domain, rather than the jury's.

We hold that the legislature's statutory elimination of lesser included offenses of felony murder does not implicate Section 5. Although a defendant has a right under Section 5 to have a jury determine his guilt of the charged crime in a felony prosecution,

26

determining what additional crimes upon which the jury should be instructed as lesser included offenses is a matter of law for the court.

Because Love's constitutional attacks on K.S.A. 2015 Supp. 21-5109(b)(1) and K.S.A. 2015 Supp. 21-5402(d) fail, the statutes prohibited the trial court from instructing the jury on intentional second-degree murder as a lesser included offense of felony murder. As a result, Love has failed to demonstrate any error in the jury instructions.

CUMULATIVE ERROR

Cumulative trial errors may require reversal if the totality of the circumstances substantially prejudiced defendant and resulted in an unfair trial. But if there is no error or only a single error, cumulative error does not supply a basis for reversal. *Dupree*, 304 Kan. at 65-66. Because we hold Love has not identified any trial errors, there is no cumulative effect of trial error to consider.

Affirmed.